758 A.2d 95

**Jacqueline MANIKHI**

v.

**MASS TRANSIT ADMINISTRATION et al.**

**No. 106, Sept. Term, 1999.**

Court of Appeals of Maryland.

Aug. 24, 2000.

Elizabeth Colette, Baltimore, for petitioner.

Callista M. Freedman (Paul F. Newhouse of the Law Office of Paul F. Newhouse, on brief), Towson; Paul D. Starr (H. Victoria Hedian of Abato, Rubenstein and Abato, P.A., on brief), Baltimore; Kathleen J. Masterton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

The petitioner, Jacqueline Manikhi (Manikhi), alleges that she was the victim of sexual harassment by a coworker that

continued over a period of years. Undertaking to assert multiple theories of liability, she sued her employer, two supervisors, three union officials, and the coworker in the Circuit Court for Baltimore City. The issue before us is the legal sufficiency of the allegations in certain counts of an amended complaint.

The employer is the respondent, Mass Transit Administration (MTA), a unit of the Department of Transportation of the State of Maryland. The events with which we are concerned are said to have occurred at night at the MTA facility on Kirk Avenue near Twenty-fifth Street in Baltimore City where buses that are not in service are cleaned, refueled, and parked on a large, open air lot. The alleged harasser is Francisco "Roy" Ovid (Ovid), another respondent. Manikhi and Ovid were classified as "A–Cleaners" of buses; both worked the night shift at the Kirk Avenue facility. The respondents, Vernon Parsons (Parsons) and Wade Moragne-el (Moragne-el), collectively, the "MTA Officials," are alleged to have been, respectively, the foreman of the night shift at Kirk Avenue and, as of 1995, the chief superintendent of that facility. Charles Pettus, Ennis Fonder, and Nelson Zollicoffer, the remaining respondents, are officials of Local 1300 of the Amalgamated Transit Union, A.F. of L.-C.I.O., and they are collectively referred to as "the Union Officials." The complaint seeks compensatory and punitive damages and counsel fees. There is no specific request for prospective relief.

The only count that survived dismissal on the face of the pleadings in the circuit court was one charging battery by Ovid. It was tried to a jury and resulted in a judgment for the defendant, apparently based on Manikhi's failure to convince the jury that a battery had occurred within the one-year period of limitations for that tort. The Court of Special Appeals affirmed the dismissal. *Manikhi v. Mass Transit Admin.,* 127 Md.App. 497, 733 A.2d 372 (1999). We granted Manikhi's petition for certiorari. 356 Md. 495, 740 A.2d 613 (1999). This certiorari review concerns Manikhi's allegations of violations of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e,[1] of 42 U.S.C. § 1983, and of Articles 24 and 40 of the Maryland Declaration of Rights, as well as counts labeled "False Imprisonment" and "Intentional Infliction of Emotional Distress." When discussing a particular claim, *infra*, we shall identify the respondents against whom the claim is asserted.

Inasmuch as the instant appeal is from the grant of a motion to dismiss for insufficient allegations in a complaint, we would ordinarily proceed directly to summarizing those allegations before determining whether they "contain a clear statement of the facts necessary to constitute a cause of action." Maryland Rule 2–305. In the instant matter, however, there is a complication. Before we can determine whether the amended complaint states one or more causes of action, we must first determine whether an affidavit by Manikhi, which she purported to incorporate into her amended complaint, forms part of that amended complaint.

I

The complaint initially filed by Manikhi was over sixty pages in length, consisting of 241 paragraphs. MTA moved to strike that complaint, arguing that it was "rambling" and constituted "an assemblage of opinions, argument, recitations of evidentiary minutiae, and extraneous allegations." Commenting that she had been unable to discern a cause of action alleged within the first forty pages of the complaint, the circuit court (Judge Bonita J. Dancy) dismissed, with leave to amend.

This dismissal was proper. Maryland Rule 2–303(b) requires that "[e]ach averment of a pleading shall be simple, concise, and direct" and that it "shall contain only such statements of fact as may be necessary to show the pleader's entitlement to relief." The rule further requires that a pleading "shall not include argument, unnecessary recitals of law,

---

1. By Public Law 92–261, 86 Stat. 103 (1972), Title VII was amended to include within the definition of "person" under 42 U.S.C. § 2000e(a), and hence of "employer," § 2000e(b), governments, governmental agencies, and political subdivisions.

evidence, or documents, or any immaterial, impertinent, or scandalous matter."

In Maryland, contrary to federal practice, dismissals for failure to state a claim are not limited to those cases in which "it appears beyond doubt that the plaintiff can prove no state of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957) (footnote omitted). *See* J.A. Lynch, Jr. & R.W. Bourne, *Modern Maryland Civil Procedure* § 6.1, at 342–47 (1993) (distinguishing between pleading requirements in Maryland and federal practice); P.V. Niemeyer & L.M. Schuett, *Maryland Rules Commentary* 161 (2d ed.1992) (same); P.M. Sandler & J.K. Archibald, *Pleading Causes of Action in Maryland* § 1.1, at 2 (2d ed.1991) (same). Instead, when drafting a Maryland circuit court complaint, it is the responsibility of counsel to distill from the client's narrative and any other relevant information acquired by investigation a concise statement of facts that will identify for the professional reader, be it adverse counsel or the court, the cause of action that is being asserted. That is the essence of "thinking like a lawyer."

In her amended complaint Manikhi reduced the allegations to twenty-five pages and ninety-nine paragraphs. The amended complaint, however, expressly states that it incorporates by reference, as part of the complaint, the matters contained in an affidavit by Manikhi which is attached to the complaint. That affidavit, consisting of fifty pages and 185 paragraphs, substantially repeats the original complaint and precipitated another round of motions to strike and to dismiss. At the hearing on those motions the circuit court (Chief Judge Robert I.H. Hammerman) described the affidavit as a "regurgitation" of the original complaint and struck the affidavit from the amended complaint.

By a footnote in her brief to the Court of Special Appeals Manikhi submitted that the affidavit materials were properly incorporated into the amended complaint. Ruling that Manikhi's footnote argument did not address the basis of the circuit

court's ruling—violation of Rule 2–303(b)—the Court of Special Appeals considered Manikhi to have waived any issue concerning the striking of the affidavit. *Manikhi*, 127 Md. App. at 509, 733 A.2d at 379. That court decided the appeal to it on the basis of the amended complaint, unenhanced by the contents of the affidavit. In her brief to this Court, Manikhi asks us to consider that the affidavit forms part of the amended complaint.

■ The circuit court did not err in striking the affidavit from the amended complaint. Incorporating the subject affidavit into the amended complaint made the amended complaint substantially indistinguishable from the original complaint. We have already held that the original complaint was properly dismissed, with leave to amend. Manikhi chose not to suffer judgment on the original complaint, but to amend. The incorporation stratagem is an effort to have it both ways. There was no abuse of discretion in striking the affidavit from the amended complaint, inasmuch as the incorporation stratagem seems clearly to have been designed to attempt to circumvent the trial court's ruling on the original complaint.

## II

The amended complaint consists of an introductory statement followed by separately numbered counts, many of which state additional facts. Each count incorporates the preceding and succeeding allegations. In most instances there is no effort to state when conduct or events occurred.

When setting forth below the material allegations of the amended complaint, we are mindful of the following rules:

■ 1. Well pleaded allegations are accepted as true for purposes of the motion to dismiss, *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492, 499–500 (1986);

■ 2. The inferences most favorable to the plaintiff are drawn from well pleaded facts, *id.;* and

3. "[A]ny ambiguity or want of certainty in [the] allegations must be construed against the pleader." *Read Drug & Chem. Co. v. Colwill Constr. Co.*, 250 Md. 406, 416, 243 A.2d 548, 555 (1968).

Manikhi was first employed by MTA in 1989. She transferred to the Kirk Avenue facility in 1991. There she was subjected to repeated sexual harassment by Ovid. This abuse continued throughout 1991, 1992, 1994, and 1995. During 1993 Manikhi transferred to MTA's Eastern Avenue facility in order to escape Ovid's conduct. For reasons that are unexplained in the complaint, Manikhi transferred back to Kirk Avenue in 1994. On October 11, 1995, Ovid elbowed Manikhi and called her a "bitch." From Manikhi's standpoint this was "[t]he last straw." On or about October 13, 1995, Manikhi filed a sexual harassment complaint with MTA's internal equal employment opportunity (EEO) office. That complaint "was resolved in her favor" by the MTA–EEO on December 8, 1995. Manikhi further alleges:

"20. Even after the December 8, 1995, favorable EEO finding for Ms. Manikhi, Defendants did not take any measures to protect her from Defendant Ovid.

"21. Ultimately, in order to get away from unlawful conduct against her, in 1996, Ms. Manikhi was forced to transfer to Northwest Division where she finally had to move to a B–Cleaner position, a lower position, which allows her to work alone.

"22. In or about August 1996, Defendant Ovid was criminally convicted of committing continuous harassment against [Manikhi] (which was reduced to a [probation before judgment] after he attended counseling), but— as they have from the beginning—Defendants have continually refused to believe [Manikhi] or protect her from Ovid, rather they have done everything they can to protect Defendant Ovid."

The allegations describing Ovid's sexually abusive conduct are graphic. They sufficiently allege persistent and unwelcome sexual harassment by Ovid. He is said to have exposed

himself, grabbed her breasts, thrust his pelvic area against her in close quarters, importuned her to have sex with him, and threatened to follow her home and have forced sex with her. Ovid and Manikhi are African–American, while Manikhi's husband is a native of the Middle East. One of Ovid's recurring themes was that Manikhi craved sex with a black man.

Principal issues in this case are whether MTA Officials had actual or constructive notice of the sexual harassment prior to October 1995, and whether, after having notice, they failed to protect Manikhi from Ovid. The Court of Special Appeals held that there was no sufficient allegation of notice prior to the formal complaint of October 1995 and that there was no sufficient allegation that the sexual harassment continued after the favorable disposition on December 8 of the MTA–EEO investigation. *Manikhi,* 127 Md.App. at 516–20, 733 A.2d at 383–85. We disagree. Taking as true the alleged facts set forth below, there was notice to MTA prior to October 1995.

Manikhi made "complaints" about Ovid to one Reed Kreider, described as Manikhi's "prior supervisor" and the predecessor to Moragne-el as chief supervisor at the Kirk Avenue facility. As noted, Moragne-el did not become a supervisor until 1995. The inference is that these "complaints" were of sexual harassment.[2] Further, Manikhi's "[c]omplaints about Ovid's unlawful conduct were ignored by MTA supervisors Parsons and Moragne-el."

██ Inferentially at a time prior to October 13, 1995, Manikhi went to one Saunders, also an alleged foreman, who advised her that she could not file a grievance against Ovid, as another member of the union. Manikhi told Saunders that "she was tired of Defendant Ovid bothering her and asked if

---

2. These allegations are found in ¶ 43 of the amended complaint in which Manikhi asserts a similarity between the unresponsiveness of Moragne-el with that of Kreider. The complaints to Moragne-el are clearly about sexual harassment, although the clearest allegations of such complaints to Moragne-el are after October 11, 1995.

there was anything else she could do to make him leave her alone." In response Saunders furnished Manikhi with a paper that said "something about [one] employee cannot stop another employee from doing their job." A factor in determining whether a hostile environment is sufficiently severe or pervasive to alter the conditions of the victim's employment, and thereby to violate Title VII, is whether the discriminatory conduct " 'unreasonably interferes with an employee's work performance.' " *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662, 676 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295, 302–03 (1993)). Accordingly, the most favorable inference to Manikhi from the description of the paper furnished to her by her foreman, Saunders, is that Saunders understood that Manikhi was complaining of sexual harassment.

Manikhi also avers that on one occasion she was in the room used for lunch breaks and crying as a result of some conduct by Ovid that is not described. Parsons "came in smiling, and jokingly said 'did your boyfriend ... Ovid do something to upset you?' " Manikhi yelled that Ovid was not her boyfriend and said to Parsons, " '[Y]ou let Ovid do anything he wants to do. I just want him to leave me alone.' " The allegation that Parsons, who did not see the cause of Manikhi's crying, was able to associate it with Ovid, to whom Parsons facetiously referred as Manikhi's boyfriend, also carries the inference of unwelcome conduct based on Manikhi's gender. In the same vein is Manikhi's averment that Parsons, "smiling and grinning," asked Manikhi if she were "peeping or spying" on Ovid who, Parsons said, had told him that that was the fact of the matter. Manikhi denied her having so acted.

Additional allegations of the amended complaint will be set forth, *infra,* when we discuss the rulings on certain of the counts which Manikhi raises before us.

### III

Manikhi charged MTA with violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e,

based on "discriminatory harassment/hostile work environment" (Count V) and "retaliation" (Count VI).

## A

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] ... terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court held that "the language of Title VII is not limited to 'economic' or 'tangible' discrimination," but that it encompasses protection for employees from hostile environment sex discrimination. *Id.* at 64, 106 S.Ct. at 2404, 91 L.Ed.2d at 58. The Court thereby endorsed decisions of federal courts of appeals that had held that a claim of hostile environment sex discrimination is actionable under Title VII. *Id.* at 66–67, 106 S.Ct. at 2405, 91 L.Ed.2d at 59.

▪ To establish a claim for sexual harassment under this provision the plaintiff must prove the following four elements:

"(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer."

*See Spicer v. Virginia Dep't of Corrections,* 66 F.3d 705, 710 (4th Cir.1995).

▪ "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 302 (1993). In determining whether the alleged harassment of an employee is sufficiently severe or pervasive to bring it within Title VII's scope, a court must examine " 'all the circumstances, [including] the frequency of the discriminatory conduct, its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.1994) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302–03).

 In the instant matter the conduct attributed to Ovid clearly satisfies the first three elements of a hostile environment violation of Title VII. For the reasons stated in Part II, *supra*, the fourth element of the violation is satisfied. Accordingly, Count V states a cause of action.

### B

 To plead "retaliation" in violation of Title VII the plaintiff must allege that

"(1) she engaged in statutorily protected expression or activity; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action."

*Knox v. Indiana*, 93 F.3d 1327, 1333–34 (7th Cir.1996); *see also Munday v. Waste Mgt. of N.A., Inc.*, 126 F.3d 239, 242 (4th Cir.1997) (same), *cert. denied*, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998).

We shall assume that Manikhi's filing of an internal complaint was a "protected activity." *Compare Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir.1999) (participation in internal investigations is covered by Title VII only when that investigation is "in response to [an EEOC] notice of charge of discrimination" and where the employer is "aware that the evidence gathered in that inquiry will be considered by the EEOC as part of its investigation"), *with* D.E. Larkin, *Participation Anxiety: Should Title VII's Participation Clause Protect Employees Participating in Internal Investigations*, 33 Ga. L.Rev. 1181, 1187 (1999) (arguing that "courts should liberally construe" Title VII because "a restrictive reading of the anti-retaliation provision has a crushing impact on employees filing internal complaints and participating in internal investigations"). On that assumption, the first ele-

ment is satisfied. Manikhi seems to rely on what we might call a "constructive demotion" theory to satisfy the second and third elements of a retaliation violation of Title VII. The Court of Special Appeals concluded, however, that Manikhi did not plead a "retaliation" claim under Title VII because she did not plead these two elements, *i.e.*, that "she [did] not allege that the MTA took an adverse employment action against her" and she "fail[ed] to allege a causal connection between a protected activity and an adverse employment action." *Manikhi*, 127 Md.App. at 520–21 & n. 10, 733 A.2d at 385 & n. 10.

A "retaliatory action" does not rise to the level of an "adverse employment action" unless it constitutes an " 'ultimate employment decision' " which may include acts " 'such as hiring, granting leave, discharging, promoting, and compensating.' " *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.) (quoting *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995)) (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981)), *cert. denied*, 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). "Actions that do not cause a change in salary, benefits or responsibility generally are not considered adverse employment actions." A.C. Modjeska, *Employment Discrimination Law* § 1:04, at 13 (3d ed.1999).

In *Munday*, 126 F.3d 239, the Fourth Circuit considered a case where an employee voluntarily resigned after being yelled at repeatedly by her employer and after her employer told other employees to ignore her and to spy on her. Although the employee felt compelled to quit, the court nonetheless held that the employer's acts did not amount to retaliation "because there was no adverse employment action." *Id.* at 243. There, the court said:

"We agree with the defendants that, as a matter of law, this scenario does not rise to the level of an adverse employment action for Title VII purposes. In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged

in protected activity, without evidence that the terms, conditions, or benefits of her employment were adversely affected. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir.1996) (Hopkins was not discharged from employment, and the comments in question were not and did not result in any adverse employment action); *DiMeglio v. Haines*, 45 F.3d 790, 804 & n. 6 (4th Cir.1995) (a reprimand and reassignment may constitute an adverse employment action); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1254 (4th Cir.1985) (the Age Discrimination in Employment Act "affords no protection unless there has been some adverse employment action by the employer. Because Bristow was not actually discharged, he relies on a theory of constructive discharge."), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986); *Evans v. Davie Truckers, Inc.*, 769 F.2d 1012, 1014 (4th Cir.1985) (Title VII retaliation claim requires adverse employment action, which does not obtain where plaintiff voluntarily resigns)."

*Id.*

In *Jensvold v. Shalala*, 829 F.Supp. 131 (D.Md.1993), however, the court considered a case where the employer gave routine tasks to a researcher and denied her opportunities to publish. The court held that these were not " 'interlocutory or mediate decisions,' " but rather qualified as adverse employment action. *Id.* at 136–37 (quoting *Page*, 645 F.2d at 233). Relying on cases from other circuits, the *Jensvold* court said:

"As the D.C. Circuit stated in *Passer* [*v. American Chemical Society*, 935 F.2d 322 (D.C.Cir.1991) ], Title VII 'does not limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer, or demotion.' 935 F.2d at 331; *see also Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990) (failure to provide job references could state valid Title VII retaliation claim); *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1532 (11th Cir.1990) (unlawful retaliation to persuade new employer to fire employee); *Passer* [, 935 F.2d] at 331–32 (cancellation of seminar honoring former employee, which humiliated him and made

it more difficult for him to procure future employment, actionable under Title VII).

"The Court finds that the allegedly retaliatory actions described *supra*, which include alleged attempts to undermine plaintiff's ability to attain a guest researcher position with Dr. Putnam, are sufficient to support a Title VII retaliation claim. Accordingly, the Court will deny defendant's motion for summary judgment with respect to plaintiff's retaliation claim."

*Id.* at 140.

 Here, the allegations of Manikhi's complaint that are critical to her retaliation theory state:

"Ultimately, in order to get away from unlawful conduct against her, in 1996, Ms. Manikhi was forced to transfer to Northwest Division where she finally had to move to a B–Cleaner position, a lower position, which allows her to work alone."

These allegations are ambiguous. Although Manikhi alleges that she was "forced to transfer" out of Kirk Avenue in order to escape "unlawful conduct," no facts are alleged that tie the forced transfer to retaliation for filing the MTA–EEO complaint. The "unlawful conduct" referred to could well be a continuation of the previous unlawful conduct without any causal connection to the internal complaint. This would not be a retaliation violation, but it would be actionable under Count V of the complaint which we have sustained in Part III.A, *supra.*

Further, even if one could infer that the "unlawful conduct" is retaliatory, that allegation is contradicted by the allegation that Manikhi sought the B–Cleaner position because it "allow[ed] her to work alone." Construing the ambiguity against the pleader results in the absence of any allegation of adverse employment action. Under that reading the demotion was voluntary. This reading is supported by the ambiguity in the allegations concerning the timing of the transfer and the timing of the demotion that is created by the adverb, "finally." One fair reading is that Manikhi transferred to the Northwest

Division and, after some period of service as an A–Cleaner, then moved to a B–Cleaner position in order to work alone. Under that reading, there is no adverse employment action and no retaliation.

For these reasons Count VI of the complaint was properly dismissed.

## IV

In Count VII of her amended complaint Manikhi sues Ovid and the Union and MTA Officials, "acting in their individual capacities under color of state law," for violation of 42 U.S.C. § 1983.[3] We conclude, for the reasons stated below, that a § 1983 claim is stated only against the MTA Officials.

In *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the United States Supreme Court held that the "equal protection component of the [Fifth Amendment's] Due Process Clause . . . confers . . . a federal constitutional right to be free from gender discrimination," unless it is substantially related to important governmental objectives. *Id.* at 235, 99 S.Ct. at 2271, 60 L.Ed.2d at 856. The Court also held that deprivations of this right "may be redressed by a damages remedy." *Id.* at 249, 99 S.Ct. at 2279, 60 L.Ed.2d at 865.[4] See *Ritchie v. Donnelly,* 324 Md. 344, 351 n. 2, 597 A.2d 432, 435 n. 2 (1991) (discussing § 1983 claim alleging gender based discriminatory discharge of deputy sheriff, but noting that legal sufficiency of factual allegations was not challenged).

---

**3.** In relevant part § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."

**4.** The gender discrimination at issue in *Davis* was a congressman's decision to fire his deputy administrative assistant because, as he stated in a letter to her, "it was essential that the understudy to my Administrative Assistant be a man." 442 U.S. at 230–31 n. 3, 99 S.Ct. at 2269 n. 3, 60 L.Ed.2d at 853 n. 3.

Since *Davis*, federal courts of appeals have held that a constitutional equal protection claim of gender discrimination may be based on sexual harassment. *See Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir.1997) ("Sex discrimination and sexual harassment in public employment violate the Equal Protection Clause of the Fourteenth Amendment."); *Cross v. Alabama, State Dep't of Mental Health*, 49 F.3d 1490, 1507–08 (11th Cir.1995) (affirming as based on sufficient evidence jury's finding of liability in § 1983 sexual harassment claim); *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir.1994) ("An allegation of sexual harassment is actionable under § 1983 as a violation of the Equal Protection Clause."); *Beardsley v. Webb*, 30 F.3d at 529 (noting that "courts have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983"); *Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2d Cir.1994) ("[A] § 1983 claim may be properly grounded on a violation of the Equal Protection Clause of the Fourteenth Amendment based on sexual harassment in the workplace."); *Bouman v. Block*, 940 F.2d 1211, 1230–32 (9th Cir.) (discussing municipal liability under § 1983 sexual harassment claim), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991); *Pontarelli v. Stone*, 930 F.2d 104, 113 (1st Cir.1991) ("[S]ex-based discrimination, including sexual harassment, is actionable under 42 U.S.C. § 1983 as a violation of the equal protection clause."); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990) ("[T]o prove sexual discrimination [under § 1983], a plaintiff must show that any disparate treatment was based upon her gender."); *Volk v. Coler*, 845 F.2d 1422, 1431 (7th Cir.1988) (setting forth the standards for "what constitutes sexual harassment and sex discrimination under § 1983 and the equal protection clause").

A principal distinction between a Title VII action and one under § 1983 was addressed in *Bohen v. City of East Chicago, Indiana*, 799 F.2d 1180 (7th Cir.1986), where the court noted that "[t]he core of any equal protection case is, of course, a showing of intentional discrimination." *Id.* at 1186. Thus, the court reasoned that

"the ultimate inquiry is whether the sexual harassment constitutes intentional discrimination. This differs from the inquiry under Title VII as to whether or not the sexual harassment altered the conditions of the victim's employment. That standard comes from the [EEOC] regulations promulgated under Title VII. Second, a plaintiff can make an ultimate showing of sex discrimination either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination. To make this showing, it is not necessary to show that all women employees are sexually harassed. Harassment of the plaintiff alone because of her sex is enough."

*Id.* at 1187 (citations omitted).[5]

In a concurring opinion, Judge Posner elaborated on how such a "conscious failure" can amount to the intent-to-discriminate required to prove an equal protection violation. He reasoned that

"[a] policy of never responding to complaints about sexual harassment can . . . be analogized to a police department's policy of never responding to complaints of rape. Such a policy would violate the equal protection clause if no effort were made to justify the policy; it would not be saved by pointing out that men sometimes rape other men and that (depending on the specific wording of a state's rape law) a woman might in principle rape a man."

*Id.* at 1190 (Posner, J., concurring). *See also Trautvetter v. Quick,* 916 F.2d 1140, 1149–51 (7th Cir.1990) (discussing *Bohen* and intent-to-discriminate).

---

**5.** For the requirement to show intent, see also *Bator v. Hawaii,* 39 F.3d 1021, 1028 n. 7 (9th Cir.1994) (noting that "a plaintiff must show intentional discrimination . . . for equal protection claims (but not for Title VII claims)"); *Beardsley,* 30 F.3d at 529 (noting that "courts have held that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983").

Other federal circuit courts of appeals have addressed the issue of intent in the context of a § 1983 sexual harassment-hostile work environment claim against one or more supervisors of the harasser. The Fifth Circuit concluded in this context "that a supervisory official may be liable under section 1983 if that official, by action or inaction, demonstrates a deliberate indifference to a plaintiff's constitutionally protected rights." *Southard*, 114 F.3d at 551. The court explained that "[t]he 'deliberate indifference' standard permits courts to separate omissions that 'amount to an intentional choice' from those that are merely 'unintentionally negligent oversight[s].'" *Id.* (quoting *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 756 (5th Cir.1993) (further attribution omitted)). *Gierlinger*, 15 F.3d 32, involved the harassment of a female state trooper by her coworkers. She sued her former commander under § 1983. The standard adopted by the Second Circuit was that "liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer." *Id.* at 34. The standard adopted by the Third Circuit in *Andrews*, 895 F.2d 1469, for § 1983 liability on the part of a supervisor for coworker sexual harassment is whether the evidence shows that the supervisor "acquiesced in the sexual discrimination." *Id.* at 1479. In *Volk*, 845 F.2d 1422, the test applied by the Seventh Circuit was whether the sexual harassment "'occurred at the direction of these officials or with their express consent.'" *Id.* at 1432 (citation and attribution omitted).

In *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir.1988), the plaintiff, a woman physician-resident, sued the supervisors of her residency program for sexual harassment perpetrated by male residents not made parties to the suit. The court stated that the plaintiff could meet the requisite element of "discriminatory intent" by showing that the supervisors' "action or inaction was 'affirmative[ly] link[ed]' to that [harassing] behavior in the sense that it could be characterized

as 'supervisory encouragement, condonation, or acquiescence' *or* 'gross negligence amounting to deliberate indifference.' " *Id.* at 896, 902 (citation omitted; quoting *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791, 804 (1985)). In reversing summary judgment for the defendants, the First Circuit found that the plaintiff presented sufficient evidence from which to infer this affirmative link based on the supervisors' "failure ... to investigate and put a stop to the harassment," and their reliance on the male residents' version of events despite "good reason to suspect [that their version was a] pretext." *Id.* at 903.

A

In the instant matter, giving to Manikhi the favorable inferences from the jumbled facts alleged in the amended complaint, there emerges the image of sexual harassment and a hostile workplace environment of which the MTA Officials should have been aware. The theme of Manikhi's allegations is that the MTA Officials would not protect her and that they did all that they could to protect Ovid. For example, in a conversation between Manikhi and Moragne-el that apparently took place after the October 1995 formal complaint, Moragne-el advised Manikhi that he had spoken with Ovid and concluded that Manikhi had been harassing Ovid because Ovid had refused to have sex with Manikhi. She further avers that, in that same conversation, she hypothesized to Moragne-el that she had been beaten and raped by Ovid in the Kirk Avenue bus parking area and that, bruised in face and body, she reported the incident to Moragne-el. She further hypothesized that Ovid told Moragne-el that there had been sex, but it was consensual. Manikhi avers that Moragne-el responded to the hypothetical by saying that no rape would have occurred.

Manikhi also avers that a few days after her formal complaint Moragne-el "yelled" at her in the presence of Ovid and Parsons. He told her to resolve her differences with Ovid or she would be terminated. When Manikhi responded by telling Moragne-el of the specific types of physical sexual abuse to which she had been subjected by Ovid, Moragne-el again told her that she should reconcile her differences with Ovid or she

would be fired. Moragne-el is also alleged to have told Manikhi that he did not care what her coworkers had witnessed and that " 'their word means nothing.' "

The complaint further alleges that Manikhi had filed a criminal complaint against Ovid. A trial that was set for November 16, 1995, was postponed. Manikhi alleges that Moragne-el wrote in a letter dated December 15, 1995, that the case was " 'thrown out' " because it was " 'not based upon any merit or substance.' " He "claimed [that] the legal resolution from the court was for her to stop her harassment of" Ovid.

The amended complaint also avers that when Manikhi told Moragne-el that she " 'would go outside the gates of MTA to seek justice,' " Parsons told her that she would " 'do no such thing.' " He said that "this was his base and he makes the decisions, and his decision for her is to stop harassing ... Ovid for sex."

In light of the allegations reviewed above and in Part II, *supra*, the amended complaint is legally sufficient for at least three reasons. First, as noted in Part II, Manikhi alleges actual notice to Moragne-el's predecessor as superintendent of the facility, and evidence of the above incidents would demonstrate a failure by the MTA Officials to protect Manikhi from further abuse. Second, the vehemence and intransigence of Moragne-el's alleged rejection of Manikhi's complaints, both during the pendency of the MTA–EEO investigation, and after its conclusion in Manikhi's favor, permit an inference of a sexually discriminatory and hostile work environment that was at least condoned at the level of state agents acting under color of law. Third, after the resolution of the MTA–EEO complaint, the MTA Officials continually refused to protect Manikhi from Ovid. She specifically alleges that after the MTA–EEO investigation she was promised that she would be "closely monitored," but she was not. Inferentially, monitoring would be done by Parsons, the immediate supervisor of Manikhi and Ovid.

For the foregoing reasons Count VII states a claim upon which relief can be granted against Moragne-el and Parsons.

B

■ No cause of action, however, lies against Ovid based on § 1983. Ovid was an A–Cleaner, as was Manikhi. He had no control or authority over her. His alleged actions were not under color of state law. *See Woodward v. City of Worland,* 977 F.2d 1392, 1400–01 (10th Cir.1992) (citing cases "declin[ing] to find liability under § 1983 against a co-employee for harassment when the harassment did not involve use of state authority or position"), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993).

C

■ With respect to the Union Officials, Manikhi recognizes that they are private individuals who would not ordinarily be liable under § 1983. Manikhi argues, however, that the Union Officials acted in concert with, or conspired with, or aided and abetted, the MTA Officials in depriving Manikhi of her constitutional right to be protected from gender discrimination. We find that the allegations of the amended complaint fail to present well pleaded facts in support of that theory. Indeed, on this phase of the case, the allegations are vague, confused, and extremely ambiguous.

In her brief to this Court, Manikhi places principal reliance on a meeting between the Union Officials and her following the October 11, 1995 incident when Ovid elbowed Manikhi. She alleged that, over a period of three hours, the Union Officials tried to dissuade her from charging that Ovid had elbowed her and that he had been sexually harassing her. The Union Officials appealed to solidarity (Ovid was a "union brother"), to racial identification (Manikhi was a "black sister"), and to sympathy (Ovid was an old man who could lose his pension). The Union Officials told her that if she would do this "then the charges would be reduced to two coworkers having a disagreement." Although Manikhi "insisted that she wanted a hearing," the Union Officials "did not properly process her grievance." She alleges that the decision not to have a hearing was made jointly by the Union and MTA

Officials who agreed "that Ms. Manikhi would lose a day's work."

These allegations confuse Manikhi's complaint of sexual harassment by Ovid, which was resolved in her favor, with what we infer to be the settlement by the Union Officials of a disciplinary matter arising out of the altercation with Ovid on October 11. That the Union was motivated in effecting the grievance settlement by the desire to protect Ovid's job security was entirely consistent with the union's acting as an adversary to, and not in collusion with, management. One cannot infer from the grievance settlement that the Union Officials were acting in concert with the MTA Officials to deprive Manikhi of protection against sexual harassment when Manikhi alleges that her sexual harassment complaint was resolved in her favor.

For these reasons we affirm the dismissal as to the Union Officials of Count III (Aiding and Abetting), Count IV (Civil Conspiracy), and Count VII (§ 1983).[6]

### D

In her conspiracy and her aiding and abetting "counts" Manikhi names MTA as a defendant. MTA is a state agency and, as such, is not a "person" under § 1983 and can have no § 1983 liability. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45,

---

**6.** It was improper pleading to allege aiding and abetting and conspiracy in separate counts of the amended complaint, as if they were causes of action independent of an underlying tort. " '[C]onspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs.*, 336 Md. 635, 645 n. 8, 650 A.2d 260, 265 n. 8 (1994). Further, to have aider and abettor liability there must be a direct perpetrator of the tort. "Thus, civil aider and abettor liability, somewhat like civil conspiracy, requires that there exist underlying tortious activity in order for the alleged aider and abettor to be held liable." *Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 340 Md. 176, 201, 665 A.2d 1038, 1050 (1995). The underlying tort is the cause of action that should be set forth in a separate count. The alleged aiders, abettors, and co-conspirators are simply additional parties jointly liable with the principal perpetrator.

58 (1989). As this Court has noted before, "an action for money damages under § 1983 cannot be maintained against a state, a state agency, or a state official sued in his official capacity." *Ritchie,* 324 Md. at 355, 597 A.2d at 437; *see also Okwa v. Harper,* 360 Md. 161, 193, 757 A.2d 118, 135 (2000) (addressing § 1983 liability for Maryland Transportation Authority police officers). It is therefore unnecessary for us to enter the bog of whether an agency can conspire with, or aid and abet, its own agents under the facts alleged here. We hold simply that joint liability theories cannot be utilized under § 1983 to assert a money damages claim against a state agency when the state agency cannot be liable for damages if it were the sole defendant.

V

Manikhi also claims under Article 24 of the Maryland Declaration of Rights.[7] Named as defendants in the Maryland Constitution count (Count XII) are Ovid and the Union and MTA Officials.

This Court has held that "the principle of equal protection of the laws is included in Art. [24] of the Declaration of Rights." *Board of Supervisors v. Goodsell,* 284 Md. 279, 293 n. 7, 396 A.2d 1033, 1040 n. 7 (1979). The relation between the constitutions of the two sovereigns was stated in *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), where we said:

"When evaluating an equal protection claim grounded on Article 24, we utilize in large measure the basic analysis

---

**7.** Article 24 of the Maryland Declaration of Rights reads:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Manikhi further asserts deprivation of her right of free speech as guaranteed by Article 40 of the Declaration of Rights, but no facts are alleged that support that claim.

No claim is asserted that Article 46 of the Maryland Declaration of Rights has been violated. That article provides that "[e]quality of rights under the law shall not be abridged or denied because of sex."

provided by the United States Supreme Court in interpreting the like provision contained in the fourteenth amendment.... Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 are 'in pari materia,' and decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other."

*Id.* at 714, 426 A.2d at 946.

One difference between the provisions concerns the remedy for a constitutional violation. "[T]he right of recovery for Federal violations arises from statute—§ 1983—whereas the redress for State violations is through a common law action for damages." *DiPino v. Davis,* 354 Md. 18, 50, 729 A.2d 354, 371 (1999) (citing *Ashton v. Brown,* 339 Md. 70, 100, 660 A.2d 447, 462 (1995)). This Court also has not adopted the federal dichotomy, under § 1983, between officials acting in their official capacity versus their individual capacity. Instead, in Maryland,

"a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages.. This liability for damages resulting from unconstitutional acts is in no way based upon the 'official/individual capacity' body of law which had developed in federal § 1983 claims. Liability has been imposed upon the government official when his unconstitutional actions were in accordance with or dictated by governmental policy or custom. Liability also has been imposed when the unconstitutional acts were inconsistent with governmental policy or custom. Moreover, ... liability has been imposed upon the official when he was acting in the scope of his employment."

*Ritchie,* 324 Md. at 370–71, 597 A.2d at 445 (citations omitted).

## A

The amended complaint states a claim against the MTA Officials for violation of Article 24. In *Ritchie, supra,*

we sustained a claim of gender discrimination in public employment that was based on both Articles 24 and 46 of the Maryland Declaration of Rights. In view of the strong public policy that is declared in Article 46, *see* note 9, *supra,* we hold that the equal protection component of Article 24, standing alone, embraces a prohibition against gender based discrimination in public employment at least to the extent found in the Fourteenth Amendment to the United States. Inasmuch as we have already held in Part IV.A that a case has been stated against the MTA Officials under § 1983, a case likewise has been stated under Article 24 against them in Count XII.

### B

Manikhi's state constitutional claim against the Union Officials was properly dismissed. We stated in *DiPino,* 354 Md. at 50–51, 729 A.2d at 371, that Maryland "Constitutional provisions have the more narrow focus of protecting citizens from certain unlawful acts committed by government officials. Indeed, *only* government agents can commit these kinds of Constitutional transgressions." (Emphasis added). The defendants in our prior constitutional tort cases have been public officials. The Court of Special Appeals, noting this fact, cited the following cases:

> "*See DiPino,* [354 Md.] at 23, 729 A.2d 354 (local police officer); *Brown,* 339 Md. at 102–04, 660 A.2d 447 (local police officers); *Ritchie,* 324 Md. at 349, 597 A.2d 432 (Sheriff of Howard County); *Clea* [*v. City of Baltimore* ], 312 Md. [662,] 664–65, 541 A.2d 1303 [ (1988) ] (Baltimore City Police Officer); *Widgeon* [*v. Eastern Shore Hosp. Ctr.*], 300 Md. [520,] 523, 534, 479 A.2d 921 [ (1984) ] (doctors employed by the State of Maryland who concluded that plaintiff suffered from a mental disorder and committed him to a hospital); *Mason v. Wrightson,* 205 Md. 481, 485, 109 A.2d 128 (1954) (Baltimore City Police Sergeant); *Heinze v. Murphy,* 180 Md. 423, 425, 24 A.2d 917 (1942) (Baltimore City Police Officer); [*Weyler v.*] *Gibson,* 110 Md. [636,] 653–54, 73 A. 261 [ (1909) ] (Warden of the Maryland Penitentiary)."

*Manikhi,* 127 Md.App. at 525–26, 733 A.2d at 388. To this list may be added *Okwa v. Harper, supra* (police officers of Maryland Transportation Authority). Because the Union Officials are not "public officials" or "government agents," but instead are individuals who represent employees under the collective bargaining agreement with MTA, their alleged misconduct cannot be comprehended by a constitutional tort.

## C

The constitutional tort count of the amended complaint was also properly dismissed as to Ovid, who is not a public official. See Part IV.B.

## VI

In the false imprisonment count of her amended complaint (Count II), Manikhi sues only Ovid. She avers that Ovid committed the tort on numerous occasions after March 1994. We need only find that one of the specific illustrations alleged by her is legally sufficient in order to sustain the count.

Manikhi avers that Ovid would get on a bus where she was working, turn off the lights, and lock the back door, "trapping her in the stairwell of the bus." Ovid would go to the back of the bus "and stand as close as he could get to her." "Ovid would tell her that he's tired of waiting for her to give" him sex. Ovid would tell her that, inasmuch as she was trapped in the stairwell, she might as well do what he told her, which is graphically described.

The Court of Special Appeals, in affirming the dismissal of this count, said that Manikhi

"does not allege that on any particular occasion Ovid unlawfully deprived her of her liberty, without consent. It is insufficient that on one occasion he allegedly told her she could not get away."

*Manikhi,* 127 Md.App. at 531, 733 A.2d at 391.

In this Court, Manikhi emphasizes those allegations in her complaint that relate to Ovid's physical efforts to block Mani-

khi's egress from the bus on which she was working, as distinct from the Court of Special Appeals' apparent emphasis on Ovid's verbal statement that she was trapped.

Ovid, by contrast, argues that Manikhi's "only allegation is that Ovid allegedly told her she could not 'get away' from him," and that that "simple statement . . . does not equate . . . to the use of force or a threat of force." Ovid argues that Manikhi made no "allegation that [she] attempted to object, to resist or to exit the stationary bus but was prevented by Ovid in some manner from doing so." In other words the asserted defect in Manikhi's complaint is that she was not restrained—she was free to go.

As a substantive matter, "[t]he necessary elements of a case for false imprisonment are a deprivation of the liberty of another without his consent and without legal justification." *The Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 654, 261 A.2d 731, 738 (1970) (citing *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 122 A.2d 457 (1956)). These three elements are alleged here.

First, Manikhi denies consent. Second, since Ovid was also an A–Cleaner, one reasonably may infer that he did not possess legal authority for his actions. *Compare K–Mart Corp. v. Salmon*, 76 Md.App. 568, 583–84, 547 A.2d 1069, 1076 (1988) (noting that "[l]egal justification is the equivalent of legal authority," and providing the example of an arrest pursuant to a valid warrant as an example of such authority), *cert. denied*, 314 Md. 496, 551 A.2d 867 (1989), *overruled on other grounds by Montgomery Ward v. Wilson*, 339 Md. 701, 664 A.2d 916 (1995). Finally, Ovid's alleged actions—locking one of the bus doors, cutting off Manikhi's only other egress from that confined area by placing himself between her and the front door, turning out the lights of that confined area on a night shift, stating that she could not get away, and barraging her with lascivious puerilities—when taken together, constitute an implicit threat of force. Despite Ovid's assertion that Manikhi "provided no allegations . . . that she attempted to leave the bus," a legally sufficient claim of false imprisonment

does not require that Manikhi have attempted to get past Ovid under these circumstances in order to discover whether his implicit threat of force would be exercised. Instead, one may reasonably infer from Ovid's implicit threat that Manikhi's liberty was restrained. *See Mason v. Wrightson,* 205 Md. at 487, 109 A.2d at 131 (noting that " '[a]ny exercise of force, or ·threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain ... is an imprisonment' " (quoting *Mahan v. Adam,* 144 Md. 355, 365, 124 A. 901, 904 (1924))).

For the foregoing reasons we shall reverse the dismissal of the false imprisonment count (Count II).[8]

---

**8.** We granted Ovid's cross petition for certiorari which raised the following question:

> "Does the unappealed jury verdict against Petitioner and in favor of Respondent Ovid in regard to all battery incidents preclude Petitioner from using the same battery incidents as the basis for her petition requesting this Court to overturn the dismissal of her claims under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights, as well as her claims for intentional infliction of emotional distress, aiding and abetting and conspiracy?"

In that cross petition for certiorari Ovid argued that the judgment in his favor on the battery count also constituted issue preclusion as to false imprisonment.

The judgments appealed from were entered on the grant of a motion to dismiss for failure to state a claim. The record extract does not contain the testimony on which Manikhi relied to get to the jury, the trial court's instructions, or any special verdict at the trial on the battery count. In order to determine whether issue preclusion applies here, it would be necessary to identify the facts that necessarily had been decided by the jury verdict and to compare them with the allegations of the amended complaint. *See Butler v. State,* 335 Md. 238, 272, 643 A.2d 389, 405 (1994) (stating that "[t]o apply collateral estoppel, we must analyze what the jury actually found based on the jury instructions that were actually given"); *Apostoledes v. State,* 323 Md. 456, 464, 593 A.2d 1117, 1121 (1991) ("A collateral estoppel analysis focuses on what the fact finder did find or must have found."); *Johnson v. State,* 303 Md. 487, 522, 495 A.2d 1, 18 (1985) ("Before claiming the benefit of the doctrine, the party employing collateral estoppel must demonstrate that the issue of ultimate fact which has been decided in the previous case is the same as the issue in the instant proceeding."), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Buford v. Bunn,* 247 Md. 203, 208, 230 A.2d 636, 637–38 (1967) (stating that " 'where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit

## VII

In an unnumbered count Manikhi sues all of the respondents, alleging intentional infliction of emotional distress (IIED).

 A claim of IIED has four elements: "(1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; (4) [t]he emotional distress must be severe." *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611, 614 (1977). The Court of Special Appeals has stated that "[e]ach of these elements must be pled and proved with specificity." *Foor v. Juvenile Servs. Admin.,* 78 Md.App. 151, 175, 552 A.2d 947, 959, *cert. denied,* 316 Md. 364, 558 A.2d 1206 (1989); *see Silkworth v. Ryder Truck Rental, Inc.,* 70 Md.App. 264, 271, 520 A.2d 1124, 1128 (same), *cert. denied,* 310 Md. 2, 526 A.2d 954 (1987).[9]

Manikhi's IIED count alleges:

"93. [The respondents] engaged in a continuing pattern of intentional and reckless conduct, that was extreme and outrageous, causing Ms. Manikhi severe emotional distress.

"94. The acts of [the respondents], including knowing refusal to protect Ms. Manikhi from Defendant Ovid's physical and verbal attacks, rise to the level of 'extreme and outrageous' conduct that is 'beyond all possible bounds of decency ... atrocious and unitarily [sic] intolerable in a civilized society.[']

---

upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action'" (emphasis omitted; quoting *LeBrun v. Marcey,* 199 Md. 223, 227, 86 A.2d 512, 514 (1952))). Consequently, and without prejudice to Ovid's asserting the issue preclusion defense on remand, we do not rule on that defense.

9. In *Foor,* the Court of Special Appeals cited *Gallagher v. Bituminous Fire & Marine Insurance Co.,* 303 Md. 201, 492 A.2d 1280 (1985), for the particularity in pleading requirement. In *Gallagher,* this Court imposed that requirement with respect to a "cause of action in this tort arising out of the nonpayment of [workers'] compensation benefits." *Id.* at 212, 492 A.2d at 1285.

"95. MTA knew of these acts, which rose to the level of physical conduct and caused Ms. Manikhi to seek medical treatment."

The Court of Special Appeals affirmed dismissal of this count, reasoning that Manikhi's allegation that she was forced to seek medical treatment fell "short of the requirement that [the element of severe] emotional distress be plead with particularity." *Manikhi*, 127 Md.App. at 534, 733 A.2d at 393.

The only specific allegation of emotional distress in the IIED count is that the respondents caused Manikhi "to seek medical treatment." Other parts of her complaint, however, are incorporated by reference into this count. Manikhi elsewhere alleges that she suffered fear at work, that the misconduct required her constantly to be alert, and that it forced her to leave Kirk Avenue for another work site, although she later returned to Kirk Avenue. Moreover, " 'in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the [severe emotional] distress has existed.' " *Harris*, 281 Md. at 571, 380 A.2d at 616 (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).

The conclusory allegations within the IIED count fail to state a claim, and there are no facts alleged anywhere in the amended complaint describing conduct of the MTA, its Officials, or the Union Officials that is "extreme and outrageous." We shall assume, however, that Ovid's conduct was extreme and outrageous. Nonetheless, we agree with the Court of Special Appeals that, even taking these factors into account, the amended complaint fails to plead facts that, if true, would rise to the level of *severe* emotional distress.

Previous cases indicate the high burden imposed by the requirement that a plaintiff's emotional distress be severe.[10]

---

10. Many previous cases have found that a cause of action in IIED did not lie because the plaintiff could not satisfy the "extreme and outrageous" element. *See, e.g., Batson v. Shiflett,* 325 Md. 684, 736–37, 602 A.2d 1191, 1216–17 (1992). We cite here only cases dealing with the requirement of severe emotional distress.

*See Caldor, Inc. v. Bowden,* 330 Md. 632, 642–45, 625 A.2d 959, 963–65 (1993) (affirming grant of judgment n.o.v. on IIED count because, although sixteen year old store employee was falsely imprisoned for four hours, coerced into signing confession that he had stolen money, and maliciously prosecuted, the evidence that he went to a psychologist one time, felt insecure and incapable of trusting others, and suffered weight loss did not suffice to show severe distress); *Harris,* 281 Md. at 572, 380 A.2d at 617 (affirming grant of judgment n.o.v. because, although other employees and a supervisor mimicked, harassed, and shamed plaintiff regarding stuttering defect, evidence that he felt humiliated and that his speech impediment was exacerbated did not suffice to show severe distress); *Vauls v. Lambros,* 78 Md.App. 450, 460–61, 553 A.2d 1285, 1290–91 (1989) (affirming grant of judgment n.o.v. on ground that Jehovah's witness, when "disfellowshipped" and harassed by defendant, failed to show that her grief, stigmatization, and destruction of her own property constituted severe emotional distress); *Hanna v. Emergency Med. Assocs.,* 77 Md.App. 595, 609, 551 A.2d 492, 499 (stating in *dicta* that trial court was correct to grant judgment on IIED count because severe depression, humiliation, and anxiety over career prospects and finances suffered by physician allegedly fired for filing civil rights claim against employer would not rise to level of severe emotional distress), *cert. denied,* 315 Md. 691, 556 A.2d 673 (1989); *Leese v. Baltimore County,* 64 Md.App. 442, 472, 497 A.2d 159, 174 (affirming dismissal for failure to state a claim when terminated employee's complaint alleged that he suffered " 'physical pain, emotional suffering and great mental anguish' " because these allegations fell "short of the 'evidentiary particulars' that must be pleaded to show a *prima facie* case of severe injury" (quoting *Harris,* 281 Md. at 572, 380 A.2d at 617)), *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985), *overruled on other grounds by Harford County v. Town of Bel Air,* 348 Md. 363, 704 A.2d 421 (1998); *Moniodis v. Cook,* 64 Md.App. 1, 15–16, 494 A.2d 212, 219 (holding that trial court erred in submitting to jury IIED claims for certain terminated employees forced to take polygraph exams because evidence of

increased smoking, lost sleep, and hives did not indicate that any of these plaintiffs was "emotionally unable, even temporarily, to carry on to some degree with the daily routine of her life"), *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985).

Manikhi's amended complaint fails to allege a "*severely* disabling emotional response," *Harris,* 281 Md. at 570, 380 A.2d at 616,. of the sort that rises above the allegations of emotional injury rejected in the cases cited. Nowhere does the complaint state with reasonable certainty the nature, intensity or duration of the alleged emotional injury. *See Moniodis,* 64 Md.App. at 15, 494 A.2d at 219 (noting that "severity [of emotional distress] is measured by factors including the intensity of the response as well as its duration" (citing *Harris,* 281 Md. at 571, 380 A.2d at 616)). For example, Manikhi does not state whether the medical treatment that she was forced to seek was of a psychological or physical nature, how long the treatment lasted, whether it was successful or is still continuing, whether it was periodic or intensive, and so forth.

Without such "evidentiary particulars," *Harris,* 281 Md. at 572, 380 A.2d at 617, the allegation that Manikhi was forced to seek medical treatment is akin to the plaintiff's assertion in *Bowden, supra,* that he went to a psychologist one time. In that case, this Court affirmed the trial court's grant of a judgment notwithstanding the verdict. On the same basis, and after taking into account all other incorporated allegations and inferences to be drawn therefrom, we affirm the dismissal of Manikhi's IIED count.

## VIII

Manikhi contends that the Court of Special Appeals violated Rule 8–206(f) because Judge Eyler, the member of the appellate panel who authored that court's opinion, had been the judge *assigned* to a prehearing conference in the case. Rule 8–206(f) provides that "[a] judge who *conducts* a prehearing conference shall not sit as a member of the panel assigned to hear the appeal in that case." (Emphasis added).

Respondents point out, and Manikhi does not dispute the fact that, after Manikhi's counsel requested a postponement of the conference, Judge Eyler instead canceled it. Because Judge Eyler did not "conduct[ ]" the conference, the plain language of the rule does not require that he have recused himself.

■ Nonetheless, Manikhi submits that Judge Eyler "had received Civil Appeal Prehearing Information Reports from all parties" and that these "reports are not part of the record." It is true that Rule 8–206(b) prohibits parties from referring to information disclosed at a prehearing conference. *See Maryland Cas. Co. v. Lorkovic,* 100 Md.App. 333, 362–63, 641 A.2d 924, 938 (1994) (noting that appellant included prehearing information report in record extract, that doing so violated Rule 8–206, and that the violation was "serious" because such a report could include confidential information about appellee); *Seidel v. Panella,* 81 Md.App. 124, 130–31, 567 A.2d 134, 137–38 (1989) (same with respect to appellee's conduct), *cert. denied,* 319 Md. 72, 570 A.2d 864 (1990).

We shall assume that Judge Eyler did in fact receive the report. From that factual predicate Manikhi attempts to demonstrate that she was harmed. The background to this phase of her argument is that the defendants had removed this case to the United States District Court for the District of Maryland, but it was remanded. In footnote 1 of the opinion of the Court of Special Appeals, that court attributes a description of the drafting of the original complaint as "painful and outrageous" to the federal district court judge who remanded this case to state court. In fact, those words were uttered by MTA's counsel during the hearing before Judge Dancy, after remand. Manikhi appears to be contending that the misattribution is a sign that she was prejudiced by Judge Eyler's authorship of the Court of Special Appeals' opinion. This contention is entirely without merit. Footnote 1 does contain a misattribution,[11] but the error is minor and totally

---

11. The Court of Special Appeals' footnote states, *"According to the transcript* of the ... hearing in circuit court, the U.S. District Judge, in

irrelevant. It has nothing to do with any possible confidential information that might have been contained in prehearing reports.

In sum, because no prehearing conference was conducted, the plain language of Rule 8–206(f) did not require the judge who initially scheduled that conference to recuse himself from the panel that heard Manikhi's appeal, and Manikhi suffered no prejudice from the presence of that judge on the panel.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS ON COUNT II (FALSE IMPRISONMENT) REVERSED AS TO RESPONDENT, FRANCISCO OVID, ON COUNT V (TITLE VII) REVERSED AS TO THE RESPONDENT, MASS TRANSIT ADMINISTRATION, AND ON COUNTS VII (§ 1983) AND XII (MARYLAND CONSTITUTION) RE-VERSED AS TO THE RESPONDENTS, WADE MO-RAGNE-EL AND VERNON PARSONS. CASE REMAND-ED TO THE COURT OF SPECIAL APPEALS AS TO THOSE COUNTS AND RESPONDENTS WITH INSTRUC-TIONS TO REMAND THIS ACTION AS TO THOSE COUNTS AND RESPONDENTS TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PRO-CEEDINGS CONSISTENT WITH THIS OPINION. AS TO ALL OTHER COUNTS, UNNUMBERED CLAIMS, AND PARTIES, THE JUDGMENT OF THE COURT OF SPE-CIAL APPEALS IS AFFIRMED.*

*COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS BETWEEN THE PETITIONER, JAC-QUELINE MANIKHI, AND THE RESPONDENTS, MASS*

---

ordering the remand, characterized the drafting of the complaint as 'painful and outrageous.' " *Manikhi,* 127 Md.App. at 505 n. 1, 733 A.2d at 377 n. 1 (emphasis added). The precise fact of the matter is that the federal district judge described the incoherence of Manikhi's complaint as "painful," initially agreed with MTA's counsel's description of it as "outrageous," but then stated, "I think it's—well, perhaps outrageous is too strong a word." After remand, at the hearing before Judge Dancy, the same counsel for MTA stated that the federal judge had described the complaint as "painful and outrageous." Thus, the transcript re-ferred to in the court's footnote does indeed attribute these words to the federal district court judge.

*TRANSIT ADMINISTRATION, FRANCISCO OVID, WADE MORAGNE–EL, AND VERNON PARSONS, TO BE PAID ONE–THIRD BY THE PETITIONER AND TWO–THIRDS BY THOSE RESPONDENTS.*

*COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS BETWEEN THE PETITIONER AND THE RESPONDENTS, CHARLES PETTUS, ENNIS FONDER, AND NELSON ZOLLICOFFER, TO BE PAID BY THE PETITIONER, JACQUELINE MANIKHI.*