769 A.2d 231

**Anna C. MAGEE,**

**v.**

**DANSOURCES TECHNICAL SERVICES, INC., et al.**

**No. 2571, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 28, 2001.

528

530

Laurence S. Kaye (Glenn R. Bergmann and Laurence S. Kaye & Associates, P.C., on the brief), Rockville, for appellant.

Mindy G. Farber (R. Douglas Taylor, Jr., and Jacobs, Jacobs & Farber, LLC, on the brief), Rockville, for appellees.

Argued before SONNER, ADKINS, and WILLIAM W. WENNER (Retired, Specially Assigned) JJ.

ADKINS, Judge.

We must decide whether summary judgment was appropriate in this employment termination case alleging hostile environment, quid pro quo, and retaliatory sexual harassment. Anna C. Magee,[1] appellant, appeals from summary judgments entered in favor of her former employer DanSources Technical Services, Inc. ("DTSI"), appellee, on all three sexual harassment counts of her complaint, as well as counts alleging abusive discharge and violation of Maryland's Wage Payment and Collection Law.[2] We find that there was ample evidence to create a dispute regarding the central question in this case— why Magee was fired. In doing so, we reject DTSI's argument that the so-called "same actor inference" overcame this evidence on summary judgment, because "where the same person hires and fires an employee it is not 'so probable' that the discharge was not motivated by discrimination that we ought to assume it is so in every case." *Molesworth v. Brandon,* 341 Md. 621, 644, 672 A.2d 608 (1996). We shall reverse the judgments on all five counts of the complaint.

## FACTS AND LEGAL PROCEEDINGS

Daniel Fahey hired Magee to become DTSI's first Human Resources Director, but her at-will employment lasted less

---

1. Although Magee's first name is Anna, she used her middle name "Cathy."

2. Magee sued Daniel Fahey, DTSI's president and controlling shareholder, only for violations of the Wage Payment and Collection Law, but later abandoned this claim because Fahey was not her employer.

than nine months. Fahey claims that he fired Magee because her excessive absenteeism made her work performance unsatisfactory. Magee claims that she was the victim of sexual harassment and retaliation.

The parties presented conflicting stories about what happened in the DTSI workplace, and why Magee was fired. They litigated two separate motions for summary judgment, which were heard by two different judges, with opposite outcomes. In granting the second motion for summary judgment, the court considered deposition testimony by Magee and Fahey, affidavits from Magee and Fahey, and Magee's answers to interrogatories. We must review the same evidence, and the inferences from that evidence, in the light most favorable to Magee, as the party opposing summary judgment. *See Heat & Power Corp. v. Air Prods. & Chemicals, Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990).

### Magee's Story

Magee retired from a position in human resources with Montgomery County on December 31, 1996. Her family had a long relationship with Fahey's family. Magee claims that in early January 1997, Fahey contacted Magee regarding the possibility of Magee coming to work for DTSI. DTSI specializes in recruiting and placing contract workers in the high-tech industry. Many of these workers are foreign nationals.

Magee agreed to meet with Fahey. At that meeting, Fahey advised Magee that he wished to create a new human resources position, and discussed hiring her in either a consulting capacity or as a permanent member of his staff. Fahey did not mention any recruitment or placement responsibilities.

Fahey hired Magee. Magee recalls that she began working in late January or early February 1997, reporting directly to Fahey. She alleges that she had advised Fahey that she needed to complete physical therapy for a back injury, and therefore would work part-time before becoming full-time. Her responsibilities included managing personnel issues relating to employee benefits, updating files for compliance with

federal and state laws, and initiating and monitoring appropriate sponsorship for foreign national employees.

Magee became the only full-time female on site at DTSI. In addition to Fahey, DTSI had several male employees who recruited and placed workers for DTSI's clients. Recruiters earned commissions for each successful placement.

Magee soon encountered a number of problems at DTSI. She alleges that in her capacity as human resources director, she brought to Fahey's attention a number of irregularities. She contends that Fahey either created, ignored, or dismissed these matters, and that he responded negatively to her refusal to "go along" with what she believed were inappropriate or illegal activities. Magee specifically complained about the following work-related disputes with Fahey.

- **Immigration Documentation.** Magee was responsible for maintaining right-to-work documentation for immigrant workers placed by DTSI. Shortly after she began work, she discovered that DTSI had a practice of not properly verifying and maintaining such records. After reviewing all of DTSI's files, Magee advised Fahey that DTSI must bring itself into compliance with federal immigration and employment laws. Fahey responded that Magee was "going overboard" and became openly resentful of her efforts to "keep the company honest." He pressured Magee to place foreign nationals who were not authorized to work. When Magee told Fahey she would not participate in any illegal activity, he put those workers without proper documentation to work, over Magee's objection.

- **Overtime Payroll.** Magee believed that some DTSI employees who were working for a particular client qualified for overtime. She advised Fahey about her concern that the failure to pay them overtime violated federal and state laws. She did not file a complaint under the Fair Labor Standards Act ("FLSA"). Fahey disagreed with Magee, and became openly upset about Magee's insistence that

the company pay overtime. But eventually DTSI did make retroactive payments to these employees.

- **Health Insurance.** Magee was responsible for managing health benefit packages for DTSI employees. She completed routine claim forms for submission to DTSI's health insurance carrier. Fahey instructed Magee to submit a form stating that Nathaniel Brous, a DTSI employee's son with a known heart condition, was an employee entitled to coverage under DTSI's health insurance. Magee objected because the son was not an employee. She refused to submit a claim on his behalf, and told Fahey that doing so would violate federal health fraud laws. Fahey demanded that she give him the paperwork.

Magee also considered the workplace at DTSI discriminatory, and repeatedly complained to Fahey that he was promoting and tolerating a hostile environment. She claims that "[f]rom almost the first time I began to work there, I complained about the discriminatory activity," and that she continued to complain about it "all the time." In support of her hostile environment charges, Magee offered a long list describing specific incidents of sexual harassment. Among the more egregious instances that Magee reported are the following:

- "Dan [Fahey] would repeatedly pin me against my chair while he would show me things on the computer, and then he would run his knee up and down my leg."

- Fahey took a photograph of a painting of a nude woman by a famous painter. "It had been on the wall across from where my desk was. He moved it over to just above my desk, so that when I looked up, I was staring at her buttocks. I told him not to put it there because I did not want to look at it. He refused to move it. Additionally, he would pat the . . . buttocks in front of me and look at me while he did it. Finally, I moved my desk so I did not have to be right under the painting."

- "On one occasion, [Fahey] moved to adjust artwork over my desk, which did not need any adjusting. He reached

across me, and bumped my breast. He then said in a disingenuous overreaction, 'Oh, I'm sorry, sorry sorry sorry sorry sorry sorry sorry sorry sorry. Don't take that wrong.' Then he stopped at the door on the way out, and said to me, referring to my breasts, 'But they're real solid.' "

- Fahey permitted one of the male recruiters to display a calendar featuring graphic photographs of nude women. Magee advised Fahey that the calendar was inappropriate and that it should be removed. Fahey "made it seem as if I was being unreasonable in requesting that it be removed." He allowed the calendar to remain on display until he moved the male recruiter into his own separate office.

- During a staff meeting, one of the male recruiters, under the guise of asking Magee for advice as the human resources director, asked her what he should do "when he turned on the computer and found a picture of two nude women defecating on a nude man." Another male recruiter asked what the site address was. Fahey then said that he had several he could give the recruiter. Magee "was pressed for an answer until [she] told them not to turn on the computer if they had a problem."

- Fahey commonly used gender-based comments regarding workplace matters. He repeatedly referred to women as "bitches." When Fahey terminated a female worker placed with a client, Magee commented that the woman did not have "the balls" to do the job. Fahey corrected her by noting that, actually, "she did not have the 'ovaries' to do the job." In addition, Fahey would say Magee was "ovulating" when she was not in a good mood. When Magee made her first hire, Fahey announced to a client and then to the entire staff that she had "lost [her] virginity."

- Fahey and the other men in the office directed dirty jokes to Magee. "Every day one of the men would confront me with a poorly constructed blatant sexual joke and then I

was asked if I was offended because I was blushing. Weekly staff meetings [included] at least one off color joke or remark."

- Magee was eventually required to recruit. But the male recruiters had first access to the latest resumes coming in from the fax machine located near them.

- "I explained it was not my mission to shake up the status quo but I was obligated to point out to my employer where there were problems." One of the male recruiters responded, "my dear I'm telling you if you don't go along with the majority you aren't going to enjoy working here." Another recruiter then said he was going to tell a joke and Magee left. She reported the incident to Fahey "and was told that sounded like good advice.... Fahey said what some people believe is sexual is art to other[s]."

- In August 1997, Magee asked counsel for DTSI to speak to Fahey about the hostile work environment. During a meeting on a particular account, Fahey concluded a telephone call, and then "said to me and [counsel] that he loved to give that 'broad' 'lots of angst.' [She] said he should not talk that way in the office. He ... laughed saying she sounded like me. I then requested that she ... instruct Mr. Fahey on what constitutes sexual harassment and a hostile work environment. I gave instances of sexual jokes, the girlie calendar, nude art, women not having ovaries to do the job. She told him none of that was appropriate and remember it was the employer's responsibility to maintain a non-hostile environment regardless if the employees were causing the problem. When [s]he left he screamed at me for embarrassing him in front of [his attorney] and that I would not attend any more meetings with [her] or [that client's] account. I told him I was submitting my resignation and he said I was too uptight and he would decide when I would leave because he would give me a bad reference and destroy my work history and at my age who would hire an old governmental employee who couldn't cut it in the corporate world."

- The next day Fahey "called me into the office and grab[bed] me around my windpipe and said he thought that was the choke hold my brother had used on me [in a December 1996 altercation] because it could crush the pipe very easily. I grabbed his hand because he was exerting pressure and tried to pull back. I slapped his hand and told him never to touch me again. I was terrified...."

Magee asserts that Fahey and DTSI retaliated against her because she objected to "the illegal and discriminatory conduct in the office." She alleges that her "responsibilities were reduced, altered and/or were significantly changed following [her] complaints of sexual harassment." She was given undesirable work assignments, and excluded from company meetings that she would have attended before she complained about sexual harassment. Fahey required her to engage in recruiting and placing consultants, which was not within her original job responsibilities, and she considered this a demotion. He informed male employees about her complaints of sexual harassment, and they responded by harassing Magee, and by increasingly using derogatory terms about women and sexually explicit language in front of her. After she complained to DTSI's attorney, she was "yelled at, demeaned, ostracized, and had things knocked off" her desk. Magee alleges that "[t]he harassment became so bad that [she] had trouble performing [her] job."

Magee also charged that in addition to the hostile environment and instances of inappropriate touching, Fahey eventually made an overt advance, which she rebuffed.

A week [after the choking incident, in August 1997], he became very sweet and confided in me that Maria, the mother of his child, was pushing him with an ultimatum to marry her or to get out. He liked the arrangement and he wasn't ready to marry again. I told him to tell her not me. He wanted to see what else was out there and then asked if I would like to go out. I told him I did not have any romantic feelings toward him and wasn't interested. Then he changed from sweetness to ugly mood and threatened me

with future problems of damage to myself, car, house, or family with the aid of his brothers. "Things just happen," he said. He reiterated that he and his brothers had a way of making sure that if someone "fucked" with him that they would be harmed or they will find their property damaged. I was told that I would start having problems with my leave and employment.

Magee alleges that from the moment she told Fahey that she was not interested in going out with him, he retaliated by escalating his harassment, and looking for a way to fire her.

From that day on I could do nothing right. I was screamed at in the office. I was belittled that I wasn't good as a recruiter either and that I wasn't a team player.... He pretended to be looking for something on my desk and deliberately knocked over a figurine, broke it, smiled and said sorry.

Magee claims that every day after she rebuffed him, Fahey said "I'm watching you." He also told two male recruiters in her presence that he was watching her. Magee learned from another male recruiter that Fahey had instructed him to "watch" her too.

Eventually, Fahey fired Magee, citing problems with her leave. Magee alleges that Fahey seized the opportunity presented by her father's death to "set her up" to take bereavement leave that he explicitly approved, and then fired her for doing so.

On 9/24/97, I contacted Mr. Fahey by phone, and told him my father was in the hospital with a heart attack.... Mr. Fahey told me that I should come to work, and that I could not do anything to help my father, since he was in the hospital. I told Mr. Fahey that my father was expected to die, and that I needed to be out, and then he said OK.

On 9/25/97, I told Mr. Fahey that my father was in a coma, and that the family was getting together at the request of the doctor to make a decision regarding maintenance or removal of life support.

On 9/26/97, I told Mr. Fahey that my father had died, and was going to be making funeral arrangements.

On 9/29/97, my father was buried. I saw Mr. Fahey at the funeral. At the church, he spoke to me, and told me not to worry, that everything would be OK.... Later, at the cemetery, he expressed his condolences to me, and told me that I should take off as much time as I needed to get over my father's death, and my job would always be there. I told him that I would be taking off until at least the end of the week. He said OK.[3]

On 10/6/97 [the following Monday], I called the office and left a message for Mr. Fahey to phone me because I was having chest pains following my father's death, and my doctor was advising me to stay out of work. Mr. Fahey did not respond.

On 10/7/97, I called and left a message for Mr. Fahey. He did not respond.

On 10/8/97 [and 10/9/97], I called and left a message for Mr. Fahey. He would not take the phone call and would not respond to me....

On 10/10/97, I received a letter from Mr. Fahey stating that I was terminated.

Magee disputes DTSI's allegation that she took excessive leave. DTSI gave each of its employees thirty days of personal leave in addition to vacation time. She contends that "throughout my employment, when I needed to use leave, I would talk with Mr. Fahey who would approve the leave." She emphasizes that at her father's funeral, Fahey, in the presence of three witnesses, told her that she could take as much bereavement leave as she needed, and that her job would be there when she came back.

Magee claims that she kept regular time sheets reflecting her attendance, but notes that by the time she was permitted to return to DTSI, she no longer had access to them. Without

---

3. Magee also submitted affidavits from two friends and her brother that are consistent with Magee's account of Fahey's statements that day.

those time sheets,[4] Magee could not state with certainty all of the occasions on which she used portions of the thirty days of leave. She admitted being absent on five separate days in order to comply with subpoenas in three different lawsuits involving other members of her family, and being absent one other day to comply with a subpoena to testify in a case brought against Montgomery County by a former employee. In addition, she acknowledges that she took two days of leave to attend an out-of-state wedding, as well as the illness and bereavement leave related to her father's death. She claims, however, that her final pay stub shows that at the time she was fired, she had "a positive leave bank" and had not used all of her vacation time.

Finally, Magee asserts that she has not been paid all of the salary, commissions, and unused vacation that are due to her. In addition to showing 22.20 hours of "remaining" vacation pay, her final pay stub (dated October 3) reflects that she was paid salary and commissions through September 27, 1997. She claims that she was terminated by Fahey's letter dated October 9th, and therefore should have received salary through that date. In addition, she contends that at the time she was terminated, she "was receiving commissions on" four workers whom she had placed successfully, but that she was not paid the remainder of those commissions after she left.

## The Story According To DTSI and Fahey

DTSI and Fahey, of course, tell a different story, but they also assert that those differences do not preclude summary judgment. Fahey was the only DTSI representative who

---

4. Magee propounded discovery requests covering her time sheets and other documents. Although she obtained a court order requiring DTSI to produce responsive documents before the second motion for summary judgment was filed, she claims DTSI has still not done so. Magee filed a second motion to compel discovery responses, but the trial court granted summary judgment before ruling on that motion. Magee argues that was prejudicial error, because she was entitled to obtain and use responsive documents to oppose summary judgment. Given our disposition, she will have an opportunity to litigate any remaining discovery issues.

presented evidence in support of the motion for summary judgment. In both his affidavit and his deposition testimony, he emphatically insisted that Magee had been chronically absent from the time she started at DTSI, and that her failure to return to work the week after her father's funeral was the "last straw."

Fahey asserted that Magee never put in a full week of work. In an undated affidavit in support of the first motion for summary judgment, he claimed that he made the offer in "late 1996," and that Magee "was supposed to start work [full time] in the first week of January 1997," as a full-time employee. He complained that Magee did not begin until February 3, 1997, and worked only 18 hours in her first two weeks. He also alleged that

[t]hroughout her employment by DanSources, she was chronically late for work, took long lunches, and left work early in the day.... [She] was frequently absent from work.... for one or more days week after week....

Ms. Magee's frequent absenteeism, and her frequent stopping and starting on tasks and projects, deprived Dan-Sources of consistency and continuity, and adversely affected her job performance. I spoke to her about her lateness and truancy, and urged her to improve her performance, which was unproductive and unsatisfactory.

Ms. Magee failed to improve her performance, and continued with her lateness and absenteeism.

Fahey also stated that Magee used all of the thirty days of her annual allotment of leave "in less than six months."

In addition, Fahey disputed Magee's allegations regarding the immigration, overtime, and health insurance incidents. He asserted that Fahey could not point to one improperly documented worker, that the employees Magee insisted were entitled to overtime were exempt from federal and state overtime laws, and that Nathaniel Brous was legitimately on DTSI's payroll.

Fahey disputed Magee's hostile environment claim, too. In his affidavit, he described the work environment as including

"occasional office banter, chatter and jokes, none of which was directed at any particular person because of his or her sex." He alleged that Magee participated in the conversations, citing the incident when Magee commented that a particular female had "balls," and he "corrected her, pointing out that this person had ovaries." He denied, however, that he or other persons in the office used the terms " 'bitch, 'ovaries' or 'ovulating' with any frequency."

Otherwise, he did not admit or deny many of Magee's specific allegations of inappropriate conduct. He did admit that one employee "discreetly kept a small nude picture in a hard to view corner of the office" and that "[i]n February 1997 Ms. Magee suggested that it be removed." In "one week or two," Fahey moved the employee to an office down the hall. He removed the picture and did not put it up again.

Fahey denied making any overtures to Magee. Noting that he is married with three children, he denied having any romantic feelings for Magee, denied asking her to date him, and denied making a date a condition or term of employment.

At his January 28, 1999 deposition, Fahey corrected a number of statements that he made in his affidavit. His testimony raised some uncertainty about Magee's leave. First, he revised his complaint that Magee had worked only 18 hours during her first two weeks on the job, estimating that she worked approximately 26 hours in those weeks. Then he revised his statement that Magee had used all of her 30 days of leave "in less than six months." Instead, Fahey testified, the correct time period was probably 8 months. He explained that he required Magee, and only Magee, to keep timesheets, because of his concerns about her absenteeism and lack of productivity. But he admitted that he never consulted the timesheets or other documentation to calculate the amount of leave Magee had taken. Instead, he relied solely on his memory, performing mental calculations to determine that she had used up all of her leave. In addition, he claimed that the amount of leave and vacation reflected on Magee's final pay stub was not accurate.

Fahey's deposition testimony also raised questions about the timing of his decision to terminate Magee. In his affidavit, Fahey stated that

in September 1997, I determined to discharge her for her frequent lateness, absenteeism, and unsatisfactory job performance, and for no other reason. That week, Ms. Magee's father passed away, so I delayed her discharge. She asked for the rest of the week off and promised to return the next Monday. She said to dock her pay because she knew she had no leave time left. She did not return to work the next Monday, Tuesday, or Wednesday.

I then discharged her on or about October 9, 1997. . . .

At his deposition, Fahey did not deny that he had given Magee permission to take bereavement leave for the remainder of the week after her father was buried. He testified that when Magee extended her leave past Monday, October 6th, the week after her father's funeral, he decided to fire her.

When she called in on Monday [October 6th], I didn't mind it. She called in on Tuesday, it bugged me. This is the message I received. Called in Wednesday, she wasn't coming in. That was it. I had to write [that] letter.

Finally, Fahey's deposition testimony undermined his claims, stated in his affidavit, that DTSI "paid [Magee] all salary and commissions she earned at the time of her discharge," and that, "[a]s a matter of policy, Dansources does not compensate employees who are terminated for unused vacation time." Fahey testified that he did not know whether Magee had been paid for October 6, 7, or 8, but asserted that he considered her last day to be October 4th rather than October 9th, the date of his termination letter. He did not offer any explanation for why Magee's last pay stub states that she was paid only through September 27th. Contrary to his affidavit statement that DTSI did not pay unused vacation hours upon termination, Fahey also testified that he paid unused vacation time to one of the male recruiters when he laid him off. He explained that DTSI's policy of not paying

unused vacation exists "[o]nly when I decide to do so," and depended completely on whether he wished to pay it.

### The Motions

Shortly after the complaint was filed, DTSI and Fahey moved to dismiss the complaint, or in the alternative, for summary judgment. They submitted Fahey's affidavit in support of the motion. Magee opposed the motion with her own affidavit, her last pay stub, as well as excerpts from Fahey's deposition and affidavit. The trial court denied the motion, finding that the central issue in the case was disputed.

The defendant says that he fired her because ... of an absentee problem. ... The plaintiff says, "You fired me for impermissible reasons." ... Well, that is a dispute, that is what the case is all about. ... [S]he alleges the impermissible reasons ... in her affidavit. ... [I]f those facts and if the rational reasonable inferences that can be drawn from those facts are believed, then she had made out a claim. ... I think that analysis ... applies to all of the counts equally.

Seven months later, DTSI filed a second motion for summary judgment. It renewed the same arguments from the first motion, but filed new evidence in support. To Fahey's original affidavit, DTSI added Magee's answers to interrogatories, excerpts from Fahey's deposition (taken shortly after the first motion was filed), and Fahey's answers to interrogatories. Magee opposed the motion, asserting the same arguments she made successfully on the first motion. She added to the record a transcript of the hearing on that motion and three affidavits from witnesses to Fahey's statements to Magee on the day her father was buried. In reply, DTSI filed excerpts from Magee's deposition, taken after the second motion was filed.

At the hearing on the second motion, the court granted judgment on all counts, stating only generally that it was satisfied by the pleadings and argument. The court held that "there is no material dispute of fact that would permit the continuation of this claim." This appeal followed.

## DISCUSSION

### I.

### Appellate Review Of Summary Judgment

■ We review the trial court's rulings on each count of the complaint separately, deciding the same questions, based on the same evidence. *See Heat & Power Corp.*, 320 Md. at 591–92, 578 A.2d 1202. In doing so, however, we are presented with a record that is not clear regarding why the trial court granted summary judgment on any of these five counts. This silence complicates our review. Generally, we limit our review to the facts and law that the trial court cites as grounds for the judgment, and we may not rely on other legal theories to affirm or reverse the judgment. *See Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co.*, 113 Md.App. 540, 553, 688 A.2d 496 (1997). Here we do not know which, if any, of the employer's many arguments and facts actually served as the basis for the court's decision. Accordingly, we must examine, on a count by count basis, each of the theories and related evidence advanced in support of the motion, and determine whether any one of them was a legally correct and factually sufficient basis for the judgment.

### II.

### Sexual Harassment Claims

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, forbids an employer from "discriminat[ing] against any individual with respect to [her] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." *Id.* at § 2000e–2(a)(1). Section 16 of Md.Code (1957, 1998 Repl.Vol., 2000 Cum.Supp.), Art. 49B ("Article 49B") also prohibits employment discrimination because of an individual's gender. Although neither of these statutes is directly applicable because DTSI has fewer than 15 employees, the substantively similar anti-discrimination provisions of the Montgomery County Code, Art. I, Chapter 27 ("Mont. Code") are applicable. This law prohibits sexual or gender

discrimination in employment by Montgomery County employers with "more than six (6) employees within the county. . . ." [5] Mont.Code § 27–18(b); *see Montgomery County v. Broadcast Equities, Inc.,* 360 Md. 438, 442, 758 A.2d 995 (2000).

Under Article 49B, section 42, "[i]n Montgomery County, . . . a person who is subjected to an act of discrimination prohibited by the County Code may bring and maintain a civil action" in circuit court within two years after the occurrence of the alleged discriminatory act. *See* Art. 49B, § 42. Thus, the anti-discrimination provisions of the Montgomery County Code, which are substantively similar to Maryland law under Article 49B and federal law under Title VII, are applicable to DTSI. *Cf. Chappell v. Southern Maryland Hosp., Inc.,* 320 Md. 483, 494, 578 A.2d 766 (1990) (comparing federal and state discrimination laws).

In the first three counts of her complaint, Magee charged that DTSI and Fahey created a hostile work environment, engaged in and tolerated quid pro quo sexual harassment, and retaliated against her after she complained about the harassment and rebuffed Fahey's advance. We must address several different arguments regarding each of these distinct "varieties" of sexual harassment.

## A.

### Count One: Hostile Environment

 The Court of Appeals' recent decision in *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 758 A.2d 95 (2000), sets

---

**5.** Although Fahey stated in his affidavit that DTSI "[a]t all relevant times . . . had less than six employees," DTSI conceded at oral argument that it has never relied on this allegation to challenge the applicability of the Montgomery Code's anti-discrimination provisions. Accordingly, we shall assume for purposes of this appeal that DTSI was subject to the Montgomery County Code. We note that, even if it were not, a common law cause of action for abusive discharge based on the alleged discrimination would lie. *See Molesworth v. Brandon,* 341 Md. 621, 637, 672 A.2d 608 (1996)(when federal and state anti-discrimination statutes are not applicable to a particular employer, an employee may pursue her discrimination claims via a common law cause of action for abusive discharge).

forth the elements and proof requirements for a hostile environment sexual discrimination claim. The Court emphasizes that the allegedly discriminatory conduct must be so "objectively" severe or pervasive that it has a substantial effect on the terms or conditions of the employment.

To establish a claim for sexual harassment under [the hostile environment] provision the plaintiff must prove the following four elements:

'(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.'

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."

*Id.* at 348–49, 758 A.2d 95 (quoting *Spicer v. Virginia Dep't of Corrections,* 66 F.3d 705, 710 (4th Cir.1995), and *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)).

In this case, we are asked to consider "how much" sexual harassment it takes to raise an "objective" inference that "it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment." *See id.* Magee argues that the trial court erred by making a factual determination regarding the evidence she proffered in opposition to summary judgment. In response, DTSI offers two arguments to explain why it was entitled to judgment on this claim. Because we do not know the trial court's reasons for granting this judgment, we shall consider both of DTSI's arguments.

### 1.

### Same Actor Inference Against Discrimination

DTSI argues that summary judgment on Magee's hostile environment claim was appropriate because of the "same actor

inference." In cases where there is no direct evidence of discrimination, DTSI contends, the employer may rely on an inference that arises when the complaining employee has been hired and fired by the same individual within a relatively short time period. DTSI asserts that in *Molesworth v. Brandon,* 341 Md. 621, 672 A.2d 608 (1996), the Court of Appeals approved the Fourth Circuit's holding that in such circumstances there is "a strong inference that the employer's stated reason for acting against the employee is not pretextual," and therefore, that the adverse employment decision was not motivated by discriminatory intent. In its seminal opinion adopting a same actor inference, the Fourth Circuit explained the factual premise underlying the same actor concept.

> '[C]laims that employer animus exists in termination but not in hiring seem irrational.' From the standpoint of the putative discriminator, 'it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them) only to fire them once they are on the job.'

*Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991) (quoting *Donohue & Siegelman, The Changing Nature of Employment Discrimination Litigation,* 43 Stan. L.Rev. 983, 1017 (1991)).

Here, DTSI asserts that the same actor inference approved by *Molesworth* "works to defeat Magee's attempt to avoid summary judgment," by "substantially" increasing "the proof required of Magee in order to avoid summary judgment...." DTSI misunderstands *Molesworth,* which is the only reported Maryland decision addressing the same actor concept. We disagree that the *Molesworth* Court approved or adopted the same actor concept in all cases where there is no direct evidence of discrimination. We also reject DTSI's contention that the same actor concept should be treated as a presumption or inference that increased Magee's burden in opposing the motion for summary judgment on her hostile environment claim. We explain.

First, we do not read the *Molesworth* Court's discussion of the same actor concept as an approval of the same actor

inference in cases involving circumstantial evidence of a hostile environment. The case involved Molesworth's claim that Brandon hired her into his veterinary practice, but then discharged her because clients did not want a female veterinarian. When Molesworth asked whether she was being fired because she was female, she was told that her gender "[was] part of it." *Id.* at 626, 672 A.2d 608. The Court of Appeals rejected Brandon's arguments that the same actor concept created a presumption that the firing was not motivated by a discriminatory animus, and that he was entitled to a jury instruction to that effect. Because a presumption is merely a substitute for direct evidence of discrimination, the Court held that "[t]he presence of direct evidence in this case ... makes a presumption regarding discriminatory intent inapplicable." *Id.* at 643, 672 A.2d 608.

The *Molesworth* Court, however, did not rest its decision solely on the presence of "direct evidence" in the case, as DTSI suggests. It also held that "the facts of this case do not warrant the creation of a presumption." *Id.* at 643, 672 A.2d 608. The Court recognized that the most important reason for creating a presumption is "probability," because " '[m]ost presumptions come into existence primarily because the judges have believed that proof of fact B renders the inference of the existence of fact A so probable that it is sensible and timesaving to assume the truth of fact A until the adversary disproves it.' " *Id.* at 643–44, 672 A.2d 608 (quoting *McCormick on Evidence*, § 343 (4th ed.1992)). It concluded that the same actor concept is based on a questionable assumption about the probability of discrimination, explaining that the universe of discriminatory possibilities is far broader than the same actor concept can explain.

> *[W]here the same person hires and fires an employee it is not "so probable" that the discharge was not motivated by discrimination that we ought to assume it is so in every case....* Here, it is possible that Brandon fired Molesworth because his clients did not want a female veterinarian. The fact that the discriminatory animus may have originated in the clients makes Brandon no less culpable for

discharging Molesworth because of her sex. It does, however, provide an explanation for his actions that is contrary to the [requested] presumption. Thus, *the probability that the discharge was not due to discrimination is not so great as to warrant the creation of a presumption based on the facts before us.*

*Id.* at 644, 672 A.2d 608 (emphasis added) (citations omitted).

The *Molesworth* Court held that the value of the same actor inference is a matter for the fact finder to decide. In doing so, it adopted the rationale of the Third Circuit, which has rejected the notion that the same actor inference is entitled, as a matter of law, to some special evidentiary weight.

Our refusal to adopt the 'same actor inference' as a presumption in this case does not preclude Brandon from making this argument to the jury.... 'But *this is simply evidence like any other and should not be accorded any presumptive value.*'

*Id.* at 645, 672 A.2d 608 (emphasis added)(quoting *Waldron v. SL Industries, Inc.,* 56 F.3d 491, 496 n. 6 (3d Cir.1995))(adopting EEOC position that value of same actor evidence is limited to what the jury decides it should be).

We recognize that *Molesworth* does not decide the specific questions now raised by DTSI—whether a same actor *inference*[6] is appropriate in a hostile environment case based on circumstantial rather than direct evidence, and whether the same actor concept justifies raising the employee's burden of proof on summary judgment. Nevertheless, we share the

---

**6.** A presumption differs from an inference in that the presumption shifts the burden of producing evidence to the employee, such that an unrebutted presumption dictates summary judgment for the employer. *See Molesworth,* 341 Md. at 642–43, 672 A.2d 608. Courts differ in whether they apply the same actor concept as a presumption or inference. *See, e.g., Shoppe v. Gucci America, Inc.,* 94 Hawai'i 368, 14 P.3d 1049, 1060–61 & n. 6, 1063 (2000) (summarizing cases applying same actor concept as a presumption or inference). Among courts applying a same actor inference, there is a difference in the weight of the inference at summary judgment. *See id.* at 1060–63 (reviewing differences in standards, and relying on strong same actor inference to affirm summary judgment in a discriminatory discharge case).

doubts expressed by the *Molesworth* Court about the need for such an inference and, more importantly, about the "probabilities" underlying the same actor concept.

Magee and DTSI disagreed about what happened at DTSI and why Magee was fired. We agree with the *Molesworth* Court that in considering conflicting information regarding an allegedly discriminatory discharge, a jury is fully capable of evaluating the significance of evidence that the same person hired and fired the plaintiff. *See Molesworth,* 341 Md. at 644–45, 672 A.2d 608. Just as the *Molesworth* Court concluded there is no reason to bypass the fact finder by way of a jury instruction adopting a same actor presumption, we see no reason for bypassing the fact finder by requiring the trial court to give special weight to same actor evidence at summary judgment. "The summary judgment process is not properly an opportunity for the trial court to give credence to certain facts and refuse to credit others." *Okwa v. Harper,* 360 Md. 161, 182, 757 A.2d 118 (2000). Thus, resolving disputes regarding facts and inferences central to a plaintiff's claim is not the trial judge's role at the summary judgment stage of litigation. To the contrary, "[i]n resolving whether a material fact remains in dispute, the court must accord great deference to the party opposing summary judgment," by making all inferences in favor of the party opposing judgment. *Laws v. Thompson,* 78 Md.App. 665, 674, 554 A.2d 1264, *cert. denied,* 316 Md. 428, 559 A.2d 791 (1989).

In hostile environment cases, it seems rather obvious that those facts and inferences must be resolved in favor of the employee. We do not agree with DTSI that the same actor evidence offers a good reason to change this rule. Like the *Molesworth* Court, we doubt the value of the same actor concept in the circumstances now before us. As this case illustrates, a female employee who alleges a hostile environment is not necessarily alleging that the employer does not want *any* women in the workplace, but rather, that the employer does not want women who are unwilling to "go along" with the climate of sexual harassment and discrimina-

tion that prevails in that workplace. Instead of excluding women, the person who hires and fires may condition the continued employment on the employee's tolerance of "on-the-job" harassment and discrimination.

■ Using a same actor inference to obtain summary judgment in a hostile environment claim ignores this very real possibility, and invites its misuse as an undeserved "refuge for scoundrels." *Cf. Vaughan v. Must, Inc.*, 542 N.W.2d 533, 539 (Iowa 1996) ("To apply such a wooden rule in an area where each case is factually distinct would effectively grant every employer a grace period at the beginning of each employee's tenure during which the employer could freely discriminate with no fear of sanctions"). Accordingly, a manager's decision to hire a woman in the mistaken belief that she will either cooperate in the sexual harassment, or that she will not "rock the boat" by objecting to it, should not be rewarded with an inference that there was no discrimination in the workplace, or with an "automatic" advantage for the employer on summary judgment.

Instead, we agree with the well-reasoned view expressed by the Seventh Circuit, that the same actor concept generally does not provide sufficient grounds for summary judgment. *The psychological assumption underlying the same-actor inference may not hold true on the facts of the particular case. For example, ... an employer might hire an employee of a certain gender expecting that person to act, or dress, or talk in a way the employer deems acceptable for that gender and then fire that employee if she fails to comply with the employer's gender stereotypes....*
[F]or [this] reason[ ], the same-actor inference is unlikely to be dispositive in very many cases. In fact, we have found no case in this or any other Circuit in which a plaintiff relying on circumstantial evidence to prove an improper motive was able to produce sufficient evidence to otherwise sustain his burden on summary judgment and yet was foreclosed from the possibility of relief by the same-actor inference. This is unsurprising given that the same-actor

inference is not itself evidence of nondiscrimination. It simply provides a convenient shorthand for cases in which a plaintiff is unable to present sufficient evidence of discrimination....

*Whether a plaintiff can survive summary judgment on a discrimination claim depends on the evidence a plaintiff is able to present. We therefore doubt the utility of broad generalizations about who is and is not likely to discriminate in deciding whether a plaintiff has produced sufficient evidence of discrimination to sustain his burden on summary judgment.*

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 745 (7th Cir.1999) (emphasis added).[7] We find this position consistent not only with *Molesworth,* but also with the established principle that conflicting evidence regarding a material issue, no matter how great the probability may seem to be on the side of one party, presents a question of fact that must be submitted to the fact finder. *See Exxon Corp. v. Kelly,* 281 Md. 689, 698, 381 A.2d 1146 (1978); *Wood v. Palmer Ford, Inc.,* 47 Md.App. 692, 704, 425 A.2d 671 (1981).

Moreover, declining to use same actor evidence as grounds for increasing the employee's burden in opposing summary judgment is consistent with the Supreme Court's recent decision regarding an employee's burden of proof in a Title VII

---

**7.** *See also Waldron,* 56 F.3d at 496 n. 6 ("Where ... the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination. But this is simply evidence like any other and should not be accorded any presumptive value") (quoted in *Molesworth,* 341 Md. at 646, 672 A.2d 608); *Williams v. Vitro Svcs. Corp.,* 144 F.3d 1438, 1443 (11th Cir.1998) ("it is the province of the jury rather than the court ... to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext"); *Vaughan,* 542 N.W.2d at 539 (same actor evidence presents "[q]uestions of fact and credibility ... [that are] more properly answered by the jury"). *See generally Castaneda v. Partida,* 430 U.S. 482, 499, 97 S.Ct. 1272, 1287, 51 L.Ed.2d 498 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group").

case. In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Court rejected the notion that when an employer offers a legitimate reason for its adverse employment action, and there is evidence from which a fact finder could conclude the proffered reason is false, the employee has the burden of putting on some additional evidence that the employer had a discriminatory animus. The Court held that imposing such a "pretext plus" burden on the employee is inappropriate, because the employer's proffered reason merely raises a "permissible" inference that may be accepted or rejected by the fact finder.[8] *Id.*, 120 S.Ct. at 2108–09. By imposing an additional proof requirement on the employee, courts that used the pretext plus standard were preventing the jury from resolving such factual inferences. *Id.*, 120 S.Ct. at 2109.

Just as the "pretext plus" standard improperly increased an employee's burden of proof in opposing summary judgment, the same actor inference that DTSI asks us to adopt also would raise an employee's burden of proof in opposing summary judgment. The effect would be the same—to prevent the jury from resolving these inferences. Requiring an employee to have "extra" evidence at the summary judgment stage of a hostile environment claim merely because the same person did the employer's hiring and firing effectively resolves inferences by assigning same actor evidence a weight that a jury ultimately may decide is not warranted.

 We hold that in a hostile environment claim, the employer may not rely on a "same actor inference" to increase the employee's burden of proof in opposing an employer's

---

**8.** The *Reeves* Court resolved a dispute among the federal circuit courts by rejecting the "pretext plus" burden of proof imposed by some courts, including the Fourth Circuit. The Court held that "a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the [employer's] legitimate, nondiscriminatory reason for its decision, is sufficient" to raise an inference that the decision was motivated by a discriminatory animus. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). The employee was entitled to have the fact finder decide that inference. *Id.*, 120 S.Ct. at 2111.

motion for summary judgment. In this context, evidence that the same person hired and fired the plaintiff within a relatively short period of time does not merit abandoning the established rule that all evidentiary inferences must be drawn in the light most favorable to the party opposing summary judgment. Instead, the proper effect of same actor evidence in such cases is the effect ultimately given to it by the fact finder. For all of these reasons, we reject DTSI's argument that it was entitled to summary judgment on the hostile environment claim based on a same actor inference. We turn now to its challenge to the sufficiency of Magee's evidence on this claim.

### 2.

### Sufficiency Of Evidence

DTSI's alternative argument in support of its judgment on the hostile environment claim is that "Magee cannot meet her burden of proving that the harassment she alleges was sufficiently severe or pervasive" to "amount to a change in the terms and conditions of her employment." We disagree, because DTSI's arguments are based on mischaracterizations of the evidence.

Referring to portions of Magee's answers to interrogatories and to excerpts of her deposition testimony, DTSI first argues that "there simply is no connotation of sex" in any of the actions Magee alleges constituted harassment. This argument is not persuasive because DTSI ignores many of the most egregious incidents of discriminatory behavior ostensibly targeted toward Magee. Magee itemized a long list of incidents and behavior that clearly could support a finding of either severe or pervasive sexual harassment, or both. DTSI has only generally denied many of these allegations, including charges that Fahey ran his knee up and down Magee's leg, fondled a nude painting while looking at Magee, commented that Magee's breasts were "real solid" after reaching across her, offered during a staff meeting to supply male employees with sexually graphic websites, and denigrated Magee's objec-

tions to a male employee's calendar that featured photographs of nude women.

We have no trouble concluding that a jury could infer from this and other evidence offered by Magee not only that there was a "connotation of sex" in such behavior, but that much of it was directed at Magee, who was the only full-time female employee in that workplace, with a discriminatory animus. We recognize that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex," because anti-discrimination laws are not intended to create a code of workplace civility, but rather to prohibit circumstances where " 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Oncale v. Sundowner Offshore Svcs.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (citations omitted). But this may be a case of harassment through the use of behavior with "sexually loaded" content and connotation. If a jury believes Magee's allegations, it could conclude that the working environment at DTSI featured discriminatory conduct that went beyond "stray remarks," "vulgarities," "offensive utterances," or other "ordinary tribulations of the workplace." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). It could conclude that Fahey and the other men in the office targeted Magee because of her gender, in order to humiliate, isolate, punish, or control her, and that in doing so, they substantially affected the terms and conditions of her employment. Alternatively, it could conclude that, even though Fahey was not directly or intentionally targeted, the workplace was a discriminatorily hostile one. *See, e.g., Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir.2001) (holding there "is no support in the law" for proposition that court may not consider conduct directed at persons other than complainant as evidence of hostile environment).

As alternate grounds for its insufficiency argument, DTSI contends that, even if an inference of harassment can be drawn from the evidence, it is entitled to summary judgment because Magee admitted at her deposition that she was not harmed by it. It points to Magee's claims that she performed her work well and that retaliation for her opposition to the company's illegal, nondiscriminatory practices was an independent cause for her termination. Again, we find this argument is not supported by the record.

First, we disagree that Magee admitted she was not terminated as a result of the sexual harassment. DTSI mischaracterizes Magee's testimony. A fair reading of the entire colloquy between DTSI's counsel and Magee indicates that Magee testified that there may have been "mixed motives" for her discharge—that she was fired because of her opposition to the discriminatory work environment, her refusal of Fahey's advance, and her refusal to engage in what she perceived as illegal conduct. We do not read her affirmative responses to counsel's inquiries regarding whether the illegal practices were "independent" causes for the discharge as a repudiation of her testimony that she was discriminated against and eventually fired because of the hostile work environment, her objections to it, and her refusal of Fahey.

Second, we disagree with DTSI's contention regarding Magee's testimony that she performed her work well in spite of the hostile environment. DTSI argues that this constituted a dispositive admission that the harassment was not sufficiently severe or pervasive to be actionable. Again, DTSI distorts Magee's testimony through its self-serving prism. We do not agree that Magee's description of her "typical day" at DTSI or her defensive answers that she performed her work well necessarily constitute such an admission.

Moreover, we are mindful that the effect of a hostile work environment on a targeted employee's work performance is only one of many factors that must be considered in determining whether the conduct was actionable. As the *Manikhi* Court recently stated, an employee is entitled to

prove a hostile environment by showing "the totality of the circumstances."

> In determining whether the alleged harassment of an employee is sufficiently severe or pervasive to bring it within Title VII's scope, *a court must examine " 'all the circumstances, [including] the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' "*

*Manikhi,* 360 Md. at 348–49, 758 A.2d 95 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. at 371) (emphasis added). Thus, there is no "magic formula" for determining when sexual harassment is sufficiently severe or pervasive to be actionable. *See, e.g., Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991) ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct").

■ In this case, Magee's allegations of harassment were sufficient to survive this "totality of the circumstances" standard on summary judgment. She described physically threatening and humiliating behavior (*e.g.,* the chokehold, Fahey touching her and commenting on her breasts). She complained about frequent and continuing conduct by Fahey and all the male employees (*e.g.,* Fahey's inappropriate touching, dirty jokes during staff meetings, denigrating references to women clients and employees), as well as specific incidents of grossly inappropriate conduct (*e.g.,* commenting on Magee's breasts, fondling a nude painting, etc.). A jury might conclude that this was sufficient to establish an abusive environment that altered the conditions of employment.

Moreover, Magee alleged behavior that interfered with her work and with her relationships with clients and co-workers (*e.g.,* unannounced "desk audits," demeaning treatment in the presence of clients, Fahey's complaints to male employees about her objections). Magee specifically alleged that she was harmed by changes in the terms and conditions of her employ-

ment, including changes in her job responsibilities (*i.e.,* addition of recruiting duties, which she considered a demotion), in her access to clients (*i.e.,* exclusion from doing business on certain accounts as a result of her hostile environment complaint to DTSI's attorney), and in her role within the company (*i.e.,* exclusion from the type of meetings she attended before complaining about hostile environment). She alleged that after it became clear that she would neither cooperate in nor remain silent about the discriminatory conduct, Fahey, and then, at Fahey's urging, the male recruiters, increasingly disregarded, ostracized, and belittled her and her work performance. From this evidence, a jury could conclude that as a result of Magee's resistance and objections to the discriminatory conduct, the hostility from Fahey and her co-workers escalated to the point that Fahey eventually manufactured a pretextual reason for firing her.

Together, Magee's allegations were sufficiently specific, severe, pervasive, and harmful enough to survive summary judgment. As the party opposing summary judgment, Magee was entitled to have this evidence, and the inferences from it, resolved in her favor. Summary judgment is not an appropriate time to resolve factual disputes or competing inferences. That appears to be what the trial court did here. We shall reverse the judgment on the hostile environment claim in count one of the complaint.

## B.

### Count Two: Quid Pro Quo Discrimination

Magee argues that the trial court erred in entering judgment on her quid pro quo count because there was disputed evidence regarding whether Fahey asked Magee if she would date him, and whether he threatened that she would "have problems with her leave and her employment" after she rebuffed him. We agree, and conclude that, like the hostile environment claim, the quid pro quo claim was premised on disputed facts and inferences that cannot be resolved on

summary judgment.[9] Clearly, the alleged threat of adverse employment action (*i.e.,* denial of leave and termination), which did eventually "come to pass," is sufficient to support this claim. *See, e.g., Burlington Indus. v. Ellerth,* 524 U.S. 742, 753–54, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998) (quid pro quo claim lies if supervising employee threatened adverse employment action and carried that threat out; hostile environment claim lies if threats were not carried out).

DTSI's argument in support of the judgment it obtained on this claim appears to be based on the same erroneously narrow reading of Magee's deposition testimony as a dispositive admission regarding the reasons for her termination. Just as that testimony did not warrant judgment on the hostile environment claim, neither did it warrant judgment on the quid pro quo claim in count two of the complaint. We shall reverse the judgment entered on that count.

## C.

### Count Three: Retaliation

 "To plead 'retaliation' ... the plaintiff must allege that '(1) she engaged in statutorily protected expression or activity; (2) she suffered an adverse action by her employer;

---

**9.** The elements of a quid pro quo claim are similar to those involved in establishing a hostile environment claim.

1. The employee belongs to a protected group.
2. The employee was subject to unwelcome sexual harassment.
3. The harassment complained of was based upon sex.
4. The employee's reaction to harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability.... [T]he employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.
5. The employer ... knew or should have known of the harassment and took no effective remedial action.

*Spencer v. Gen. Elec.,* 894 F.2d 651, 658 (4th Cir.1990), *overruled on other grounds by Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

and (3) there is a causal link between the protected expression and the adverse action.'" *Manikhi,* 360 Md. at 349, 758 A.2d 95 (quoting *Knox v. Indiana,* 93 F.3d 1327, 1333–34 (7th Cir.1996)). Magee argues that the trial court erroneously granted summary judgment on the basis of one or more of the erroneous theories DTSI advanced in support of its motion for summary judgment on this count. DTSI renews those arguments, which track all three of the elements of a retaliation claim.

First, DTSI argues that Magee's complaints about the hostile work environment, made to Fahey and DTSI's attorney but not in any formal complaint, were not "protected activity" for purposes of federal or state anti-discrimination statutes. We disagree. An employee's verbal protests to the employer regarding what the employee perceives as discriminatory practices are protected activities. In *Chappell v. Southern Maryland Hosp., Inc.,* 320 Md. 483, 578 A.2d 766 (1990), the Court of Appeals held that Maryland's Fair Employment Practices Law tracks the "anti-retaliation" language of Title VII, and by analogy, provides protection for a broad range of activities.

> The opposition and participation clauses ... have been liberally applied by the courts to shield employees who speak out against an employer's unlawful employment practices, the obvious rationale being that without some guaranteed protection to assert equal employment rights, the ultimate purpose of the act would be severely limited.

*Id.* at 494–95, 578 A.2d 766 (collecting cases). The *Chappell* Court noted that an employee may have a cause of action for retaliation under either federal or state anti-discrimination statutes, based on his allegation that he was fired for complaining to his employer about allegedly discriminatory employment practices. *See id.* at 495–96, 578 A.2d 766.

Second, DTSI argues that Magee has not alleged any employment actions that were sufficiently adverse to be actionable retaliation. "Adverse employment actions" must involve an "'ultimate employment decision,'" such as a deci-

sion to grant leave, demote, reassign, and discharge. *Manikhi*, 360 Md. at 350–51, 758 A.2d 95. " 'Actions that do not cause a change in salary, benefits or responsibility generally are not considered adverse employment actions.' " *Id.* at 350, 758 A.2d 95 (quoting A.C. Modjeska, *Employment Discrimination Law* § 1:04, at 13 (3d ed.1999)). We agree with Magee that she provided sufficiently specific evidence—via her affidavit, her answers to interrogatories, and her deposition testimony—to raise a dispute of fact as to whether there were retaliatory employment decisions in this case, *i.e.*, the decisions to grant or deny leave, to reassign and demote her to recruiting responsibilities, and to discharge her.

Third, DTSI argues that Magee cannot show a nexus between her protected activity and the alleged retaliation. It asserts that Magee must prove that "but for" having engaged in protected conduct, she would not have had adverse action taken against her. In support of this standard of proof, DTSI cites the "but for" jury instruction that the Court of Appeals in *Molesworth* held "adequately describe[d] the burdens of proof in a sex discrimination case." *Molesworth*, 341 Md. at 645, 672 A.2d 608. Magee counters that the "but for" standard does not apply. She cites this Court's opinion in *Brandon v. Molesworth*, 104 Md.App. 167, 655 A.2d 1292 (1995), *aff'd in part, rev'd in part*, 341 Md. 621, 672 A.2d 608 (1996), which states that "although the employee bears the burden of persuasion that discrimination was 'a motivating factor,' the employee need not prove that but for the discrimination she would not have been discharged." *Id.* at 191, 655 A.2d 1292.

We agree with Magee, and conclude that DTSI again has misread *Molesworth*. The jury instruction that DTSI relies on for its "but for" standard was as follows: "The [p]laintiff must prove [that] ... but for the [p]laintiff's gender the [d]efendant would not have made the decision not to continue the [p]laintiff's employment." *Molesworth*, 341 Md. at 645, 672 A.2d 608. The *Molesworth* Court approved this instruction, but not without placing the following footnote after the words "but for":

The plurality decision in *Price Waterhouse [v. Hopkins,* 490 U.S. 228, 240, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) ], ruled that "[t]o construe the words 'because of' as a colloquial shorthand for 'but-for causation,' ... is to misunderstand them."

Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations. When, therefore, an employer considers both gender and legitimate factors at the time of making a decision, that decision was "because of" sex and the other, legitimate considerations—even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account. *Id.* at 241, 109 S.Ct. at 1785.

*Molesworth,* 341 Md. at 645 n. 8, 672 A.2d 608. Indeed, the language that Magee cites from this Court's opinion in *Brandon* reflects the plurality's opinion in *Price Waterhouse.* *See Brandon,* 104 Md.App. at 191, 655 A.2d 1292.

 We conclude that Magee presented sufficient evidence to raise a question of fact regarding whether her gender was a motivating factor for the alleged demotion, exclusion, harassment, or discharge. Whether Magee's complaints about retaliation are merely a pretextual umbrella to hide her misconduct and unsatisfactory work performance, or DTSI's complaints about Magee's absenteeism and poor work record are merely a pretextual umbrella to hide their retaliatory actions, are disputed matters of fact. For the reasons we have discussed, DTSI is entitled to litigate these matters to the jury, but not to have them resolved on summary judgment.

### III.

### Count Four: Abusive Discharge

 To assert a cause of action for abusive discharge, the employee must allege (1) discharge; (2) in retaliation for refusing to violate some clear mandate of public policy that is reflected in a statute but is not vindicated by that statute or elsewhere; and (3) a causal nexus between the public policy violation and the decision to discharge. *See Insignia Residen-*

*tial Corp. v. Ashton,* 359 Md. 560, 567–68, 755 A.2d 1080 (2000). Magee argues that the trial court erred in granting judgment on her abusive discharge claim because "[t]here is a dispute of fact about whether the law was violated," and about whether there was a nexus between her complaints of illegal practices and her termination. DTSI counters that the judgment was appropriate because Magee cannot establish the second and third elements of this cause of action. Although we agree with DTSI regarding two of the three public policy grounds on which Magee bases this claim, we shall reverse the judgment because Magee has a cause of action on her third ground for this count.

## 1.

### The Law: *Adler, Makovi, Watson,* and *Insignia*

Preliminarily, we review the Court of Appeals' decisions on this judicially created cause of action. In *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals first recognized the now familiar limitation on an employer's discretion to fire an at-will employee. "[A]n employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Id.* at 35, 432 A.2d 464. The reason for the discharge, however, may not violate a "clear mandate of public policy." *Id.* at 47, 432 A.2d 464. A tort claim for abusive discharge of an at-will employee lies "when the motivation for the discharge contravenes some clear mandate of public policy." *Id.*

Since the *Adler* decision, the Court has limited the type of claims that can be pursued via an abusive discharge cause of action. Most importantly, in *Makovi v. Sherwin–Williams,* 316 Md. 603, 561 A.2d 179 (1989), the Court held that an abusive discharge claim will not lie "when the public policy violated by the discharge arises from a statute that provides its own remedy for the violation," because "[a] separate tort action [is] unnecessary in such a situation." *Insignia,* 359 Md. at 561–62, 755 A.2d 1080 (explaining *Makovi*). Makovi claimed that when she became pregnant, her employer wrong-

fully discharged her in violation of the public policy embodied in Title VII and the Maryland Fair Employment Practices Law. The Court held that because "the statutes create both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception ..., the generally accepted reason ... of vindicating an otherwise civilly unremedied public policy violation, does not apply." *Makovi*, 316 Md. at 626, 561 A.2d 179.

In *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991), however, the Court of Appeals held that *Makovi* does not apply in cases where the discharge violated more than one public policy. Recognizing that there may be multiple sources of public policy applicable to a disputed discharge, the Court held that if at least one public policy mandate arises from a law that does not provide its own remedy, an abusive discharge cause of action may be based on that unremedied violation. *See id.* at 485–86, 588 A.2d 760. Thus, the fact that the same conduct also violates a statute that does provide its own remedy will not, by itself, bar the employee's abusive discharge claim. *See id.*

The Court of Appeals applied this exception to the *Makovi* rule to preserve Watson's abusive discharge claim. Watson claimed that she was discharged in retaliation for filing a sexual harassment lawsuit. She alleged three incidents, in which a fellow employee invited her to engage in sexual activity, and then became more aggressive, placing his hands on her shoulders, attempting to bite her breast, and committing other assaults and verbal abuse. The Court held that an action for abusive discharge cannot be predicated on allegations that an employer retaliated against the employee for filing a lawsuit alleging the employer tolerated a hostile environment form of sexual discrimination. But, the Court also recognized that the jury might have found that Watson's discharge was motivated by her suit against the co-worker for assault and battery. It held that Watson's allegations of assault and battery established an alternative public policy mandate for her claim, *i.e.*, "the clear mandate of public policy [against] discharg[ing] an employee for seeking legal redress

against a co-worker for workplace sexual harassment culminating in assault and battery." *Id.* at 480–81, 588 A.2d 760. Thus, the *Watson* Court construed *Makovi* as limited to cases in which each and every public policy relied on by the plaintiff is " 'expressed in a statute which carries its own remedy for vindicating that public policy.' " *Id.* at 485, 588 A.2d 760 (quoting *Chappell,* 320 Md. at 490, 578 A.2d 766).

The Court's most recent decision regarding the boundaries of an abusive discharge cause of action is *Insignia Residential Corp., supra.* Interpreting and applying *Makovi* and *Watson,* the *Insignia* Court considered whether an abusive discharge claim may be based on an employee's allegations of "quid pro quo" sexual harassment. The plaintiff had alleged that an Insignia official discharged her because she refused to have sex with him. The *Insignia* Court acknowledged that the plaintiff had a clear remedy available to her under Title VII, but held that the "*Makovi* rule" was not a bar to her abusive discharge claim. It held that the employee's distinctive allegations that the co-worker demanded sex in exchange for employment favors were sufficient to state a "*Watson* exception," based on the existence of an alternative public policy mandate against prostitution, for which the plaintiff had no civil remedy.

> The statute precluding prostitution and attempts to induce or coerce women and men into engaging in prostitution represents a clear mandate of public policy that is violated when an at-will employee is discharged for refusing to engage in conduct that would constitute prostitution. . . .
> The fact that both the inducements themselves and a discharge for rejecting them may constitute a violation of the Federal and State employment discrimination laws does not require that we ignore that such conduct also violates the entirely separate, independently based, public policy embodied in § 15. Ms. Ashton's action for abusive discharge is not precluded by *Makovi;* it is authorized by *Watson.*

*Id.* at 573, 588 A.2d 760.

In this case, we must consider whether the "*Makovi* rule" applies to bar Magee's abusive discharge claim—in other

words, do all three of the public policy mandates that Magee cites as grounds for her abusive discharge claim arise from statutes that otherwise offer her civil redress? For the reasons discussed below, we agree with DTSI that Magee cannot escape the *Makovi* rule under two of her three alternative grounds for her abusive discharge claim. With respect to the one ground that survives the *Makovi* rule, we find that Magee has offered sufficient evidence of a causal connection between the policy and the discharge.

## 2.

## Overtime Pay Required By The Fair Labor Standards Act

One public policy mandate on which Magee relies is the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*[10] She alleges that DTSI's failure to pay overtime to certain workers violated the FLSA, and that DTSI and Fahey retaliated against her when she complained about it. Nevertheless, she admits that FLSA provides its own remedy for any such retaliation, but argues that she was not entitled to exercise that remedy because she did not file a complaint regarding the alleged violations of that law. The answer to this argument is that Magee cannot use her own decision not to avail herself of that remedy to bootstrap herself into a claim that she would not have needed to assert if she had pursued that remedy. *See Chappell,* 320 Md. at 496–97, 578 A.2d 766 (adequate remedies under FLSA barred abusive discharge claim by employee who made only internal complaint about violations); *Gaskins v. Marshall Craft Assocs.,* 110 Md.App. 705, 715, 678 A.2d 615 (1996) (FLSA and Art. 49B both provide mechanisms for redressing violations and retaliatory or abusive discharges).

---

**10.** Section 215(a)(3) of the FLSA makes it unlawful

to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding. . . .

Moreover, we are not persuaded by Magee's complaint that she cannot be penalized merely because DTSI fired her before she filed a complaint. This argument presumes a material fact that, in all of her detailed allegations, Magee has never alleged—that she intended or attempted to file such a complaint. She is not entitled to the benefit of such a *post hoc* hypothetical.

Magee cites no other "unvindicated" public policy mandate as grounds for a *"Watson"* or *"Insignia"* exception to the *Makovi* rule. We conclude, therefore, that she is precluded from premising her abusive discharge claim on her allegations concerning overtime violations of the FLSA.

**3.**

### Federal Documentation Requirements For Immigrant Workers

As her second public policy mandate, Magee cites the immigrant documentation laws under 8 U.S.C. section 1324a, which include verification and recordkeeping requirements designed to restrict illegal harboring and employment of foreign nationals who do not have permission to work in this country. She alleges that Fahey and DTSI retaliated against her when she complained about incomplete right to work documentation for foreign nationals that Fahey put to work with DTSI's clients. Once again, however, that statutory scheme provided Magee redress for unfair immigration-related employment practices, including civil remedies for intimidation or retaliation because she "intend[ed] to file ... a charge or complaint...." 8 U.S.C. § 1324b(a)(5) (prohibition against intimidation or retaliation); *see* § 1324b(b) ("persons adversely affected by unfair immigration-related employment practice ... may file a charge ... with the Special Counsel"); § 1324b(d)(2) (right to file private action if Special Counsel does not file complaint with administrative law judge within 120 days). Thus, Magee cannot show that a violation of this public policy is unvindicated by a civil remedy. She cites no alternative public policy mandate that would except her from

the *Makovi* rule. Accordingly, she cannot predicate her abusive discharge claim on the alleged violation of immigration documentation laws.

## 4.

### Federal Law Against Health Care Benefit Fraud

As the third and final ground for her abusive discharge claim, Magee argues that the discharge was in retaliation for her refusal to violate the health care fraud provisions of 18 U.S.C. sections 24 and 1347 and Md.Code (1982, 2000 Repl.Vol.), section 15–123 of the Health General Article, by submitting a false insurance claim form regarding Nathaniel Brous.[11] The cited State statute covers fraud relating to medical assistance programs for the indigent, which do not apply to Magee's claim. The federal statute, however, makes it a crime to knowingly defraud a health care benefit program. We have found no civil remedy that would provide Magee redress for adverse employment actions taken in retaliation for her complaint about health care benefit fraud. Accordingly, Magee's claims based on this statute fall outside the *Makovi* rule, in that they seek vindication not otherwise available to Magee.

DTSI argues that, nevertheless, the federal statute does not rise to the level of a clear mandate of public policy for which there ought to be an abusive discharge cause of action. We disagree. This criminal statute could not be clearer; it constitutes a strong and clear public policy mandate against filing fraudulent health insurance claims. Thus, Magee's evidence of health care benefit fraud satisfied the second "unvindicated public policy mandate" element of an abusive discharge cause of action.

---

11. DTSI relies on *Lee v. Denro, Inc.*, 91 Md.App. 822, 605 A.2d 1017 (1992), for the proposition that no abusive discharge claim lies for a "mere" internal complaint about employer practices. *Lee's* holding however, is explicitly limited to cases where "there is no affirmative direction by an employer that an employee violate a recognized public policy." *Id.* at 835, 605 A.2d 1017. Here, Magee alleges that Fahey directed her to file a fraudulent claim.

■ We must proceed to consider, then, whether Magee has offered sufficient evidence on the third element of an abusive discharge claim—a causal nexus between the public policy and the decision to discharge. Although it is a much closer question than others presented by this appeal, we conclude that Magee has done so. Resolving all inferences against summary judgment, we conclude that Magee alleged some connection between her objection to filing the false claim and the deterioration of working conditions that culminated in her termination. Magee alleged that when she objected to filing the claim, Fahey called her a "fucking nuisance" and took matters into his own hands. She testified that she believed that the incident was an "independent cause" for the termination. Although we cannot tell from the record before us when this incident occurred, we think Magee sufficiently alleged evidence from which a fact finder could conclude that the incident contributed to Fahey's decision to fire her. Because Magee can predicate her abusive discharge claim on the last of the three alternative grounds she advanced, we shall reverse summary judgment in favor of DTSI on count four of the complaint.[12]

## IV.

### Count Five: Wage Payment And Collection Violations

■ Magee argues that the trial court erred by granting summary judgment on her claim against DTSI under Maryland's Wage Payment and Collection Law (the "Act"),[13] codi-

---

**12.** Our holding that Magee had claims for retaliatory discharge under FLSA and unfair immigration-related employment laws is not intended to decide whether Magee may pursue those claims after remand. Whether Magee may amend her complaint to add such claims is a matter for the trial court.

**13.** The Act provides a remedy for employees to collect "all compensation that is due to any employee for employment," including salary, commissions, and fringe benefits. *See* LE § 3–501(c) (defining wage), § 3–505 (requiring prompt payment of wages after termination); § 3–507.1 (providing civil remedy against employer who fails to pay in accordance with § 3–505).

fied at Md.Code (1991, 1999 Repl.Vol.), §§ 3–501—3–509 of the Labor and Employment Article ("LE"), because there was sufficient evidence to raise a dispute regarding whether DTSI paid her all the salary, commissions, and vacation pay that she claims DTSI owed her. We agree, for the following reasons.

- **Salary.** Magee's pay stub shows that DTSI paid her only through September 27, even though she was not terminated until October 9th. Whether DTSI was entitled to "dock" her salary because she took leave on the days for which she was not paid is a question of fact that cannot be resolved on summary judgment.

- **Commissions.** It was undisputed that Magee earned commissions on workers that she successfully placed. In her answers to interrogatories, Magee named four workers that she placed, and claimed that she had been receiving commissions from these placements at the time she was terminated. Commissions are wages within the scope of the Act. *See* LE § 3–501(c)(2)(ii). Contrary to DTSI's contentions, under the Act, employees may have a cause of action based on an employer's failure to pay commissions that were earned during the employment, but which were not payable until after the employee was terminated. *See Admiral Mortgage, Inc. v. Cooper,* 357 Md. 533, 544, 745 A.2d 1026 (2000) (employer who refused to pay employee commissions earned during employment but payable after termination was entitled to have jury decide claim under the Act). In this case, Magee similarly was entitled to take her commission claim to the jury.

- **Vacation Pay.** Magee's final pay stub reflects 22.20 hours of "remaining" vacation pay, and she asserted under oath that she was not paid for unused vacation. Although Fahey claimed in his affidavit that DTSI has a policy of not paying unused vacation upon termination, he later admitted in his deposition that the "policy" consisted of what Fahey decided in a particular case, and that he had paid unused vacation to at least one other terminated employee. In these circumstances, whether DTSI had a policy of denial or a practice of payment, and whether

Magee had any unused vacation remaining, are questions of fact for the jury.

We shall reverse the trial court's erroneous grant of summary judgment on count five of the complaint.

**JUDGMENT REVERSED ON ALL COUNTS. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**